[No. A039389. First Dist., Div. Two. Nov. 4, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
MAXIE JOE HOLIFIELD, Defendant and Appellant.

COUNSEL

Kent A. Russell, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugujama, Assistant Attorney General, Gerald A. Engler and Herbert F. Wilkinson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SMITH, J.—Defendant Maxie Joe Holifield was convicted by jury of inflicting corporal injury on a cohabitant (Pen. Code, § 273.5, charged as a felony) and sentenced to the middle term of three years in state prison.[1] He appeals on void-for-vagueness, instructional and evidentiary grounds—all based on the issue of what constitutes "cohabiting" under the statute. We affirm.

## BACKGROUND

Since the assault itself is not relevant to any issue on appeal, it suffices to note that defendant beat and otherwise terrorized his victim, Mary Andres, for two hours in her motel room residence in Eureka, inflicting facial injuries and severe contusions over much of her body.

Evidence of cohabitation came from defendant and the victim. Andres lived in a nine- by twelve-foot "sleeping room" in the Anderson Motel. It contained a double bed, desk, TV and chair, and there was an adjoining bathroom. There was no kitchen; meals were prepared with a toaster oven and a hot plate. Andres had lived there for about a year. It was her only residence, and she alone paid the rent. She and defendant had been seeing each other off and on for four years. Andres was age 53 and defendant about 35 at the time of the offense, on August 29, 1986.

---

[1] All further section references are to the Penal Code unless otherwise indicated.

Section 273.5 provides in relevant part (italics ours): "(a) Any person who willfully inflicts upon his or her spouse, or any person who willfully inflicts upon *any person of the opposite sex with whom he or she is cohabiting,* corporal injury resulting in a traumatic condition, is guilty of a felony, and upon conviction thereof shall be punished by imprisonment in the state prison for 2, 3 or 4 years . . . . [¶] (b) *Holding oneself out to be the husband or wife of the person with whom one is cohabiting is not necessary to constitute cohabitation as the term is used in this section.*"

Defendant was also convicted of misdemeanor battery (§ 242), a lesser offense than a charged count of aggravated assault (§ 245, subd. (a)(1)), and a six-month county jail term for that offense was imposed but stayed.

Testimony focused on the three months (June through August) preceding the assault. According to Andres, defendant stayed with her during June, rented and stayed at rooms in two other motels in the first part of July, returned to her on July 5, stayed elsewhere for about two weeks (sometime in July or August when he had received a paycheck) and then returned, staying with her continuously for the last two weeks preceding the assault on August 29. He apparently took his clothes and other belongings with him each time he left. The two did not share rent, have a joint bank account, make joint purchases or hold themselves out as husband and wife. Defendant worked long days in Arcata. He would frequently come home from work, shower and then leave without her to go visit friends. "Not much" was her answer to whether they ate meals together.

Andres testified that they shared the same bed (the only one in the room) and had "infrequent" sex, the last time less than a month before the incident. Asked if the relationship was "romantic," she testified that she did care about him. She was emotionally attached to him, but the feeling was not returned. For that reason, and despite their occasional sexual relations, she described their relationship as that of friends and roommates—not an "intimate" one. To her, the word intimate "means a closeness, emotionally, and it is more than sex . . . ."

Defendant's testimony was consistent with Andres's as to the times when he stayed with her during the three months preceding the assault. He emphasized, however, that he only kept some of his belongings there (a duffel bag and suitcase containing work and after-work clothes) and had clothing stored at three other people's residences as well. He was vague as to where some of it could currently be found.

Defendant testified to a less intimate relationship than Andres described. He admitted sleeping in her bed with her whenever he was there (there was no room to sleep on the floor) but said he slept on top of the covers, with his pants on, and last had sexual relations with her about four years ago. According to him, Andres was just allowing him to store his things, shower and rest there, and they did not cook meals together. He said he did not have a key to Andres's room but that she left the door unlocked.

APPEAL

I

Defendant urges that section 273.5 is void for vagueness in that the statute does not comprehensively define what constitutes "cohabiting" and

no single definition of that term is available in the case law or commonly understood.

The governing law is settled: "That no person shall be deprived of life, liberty or property without due process of law is, of course, a cornerstone of our jurisprudence. (U.S. Const., Amends. V, XIV; Cal. Const., art. I, § 7.) ■ 'The requirement of a reasonable degree of certainty in legislation, especially in the criminal law, is a well established element of the guarantee of due process of law.' [Citation.] To withstand a facial vagueness challenge under the due process clause, a statute must satisfy two basic requirements.

"First, a statute must be sufficiently definite to provide adequate notice of the conduct proscribed. '[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law. [Citations.]' [Citations.] '[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning.' [Citations.]

"Second, a statute must provide sufficiently definite guidelines for the police in order to prevent arbitrary and discriminatory enforcement. 'A vague law impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.' [Citation.] 'Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections."' [Citation.]" (*People v. Superior Court (Caswell)* (1988) 46 Cal.3d 381, 389-390 [250 Cal.Rptr. 515, 758 P.2d 1046].)

The identical vagueness challenge raised here was recently rejected by Division Three of this court in *People v. Ballard* (1988) 203 Cal.App.3d 311 [249 Cal.Rptr. 806] (*Ballard*). Finding first that the defendant could not complain of vagueness when his conduct in that case clearly amounted to "cohabiting" under any definition of the term, the court alternatively found no facial vagueness, reasoning in part as follows: " . . . '[A] statute is sufficiently certain if it employs words of long usage or with a common law meaning, "notwithstanding an element of degree in the definition as to which estimates might differ." [Citations.]' (*Lorenson v. Superior Court* (1950) 35 Cal.2d 49, 60 . . . .) . . . [U]nder this rule the statute is clearly constitutional, since the term 'cohabit' has been used in California statutes

and decisions for at least 100 years and has an established common law meaning.

"As early as 1888, a member of the Supreme Court observed that 'living together and cohabitation mean the same thing.' (*Sharon* v. *Sharon* (1888) 75 Cal. 1, 56, 61 . . . (dis. opn. of Thornton, J.).) A few years later, in *Kilburn* v. *Kilburn* (1891) 89 Cal. 46, 50 . . . , the court stated that 'by cohabitation is not meant simply the gratification of the sexual passion, but "to live or dwell together, to have the same habitation, so that where one lives and dwells there does the other live and dwell also." [Citation.]'

"After 1902, the appellate courts settled on the definition as stated that year in *Estate of Mills* (1902) 137 Cal. 298, 301 . . . : 'The word "cohabiting," . . . means the living together of a man and woman ostensibly as husband and wife. (1 Bishop on Marriage, Divorce, and Separation, sec. 1669, note 1.)' (See *Kusior* v. *Silver* (1960) 54 Cal.2d 603, 609-614 . . . , for a discussion of the derivation and meaning of the term.) This definition has been used extensively in civil litigation, especially where paternity is an issue under, for example, Civil Code section 7004 [child born within 300 days after 'termination of cohabitation'] or Evidence Code section 621 ['the issue of a wife cohabiting with her husband' is presumed the child of the marriage]. And further, it is well settled that ' "Cohabitation means simply to live or dwell together in the same habitation; evidence of lack of sexual relations is irrelevant." [Citation.]' (*Michael H.* v. *Gerald D.* (1987) 191 Cal.App.3d 995, 1006 . . . .)" (*Ballard, supra,* 203 Cal.App.3d at pp. 317-318.)

*Ballard* goes on to list many California statutes that use the term "cohabit" in one form or another without definition, noting in particular its use in legislation known as the Law Enforcement Response to Domestic Violence (§§ 13700-13731), which "promotes the same goal as [section 273.5]—the protection of persons from violence committed by their domestic partners or others with whom they have a *significant relationship*." (*Ballard, supra,* 203 Cal.App.3d at p. 318, italics added.) That goal is partly reflected in section 13700, subdivision (b), which provides: " 'Domestic Violence' [as used in this title] is abuse committed against an adult or fully emancipated minor who is a spouse, former spouse, cohabitant, former cohabitant, or a person with whom the suspect has had a child or has or has had a dating or engagement relationship." *Ballard* (203 Cal.App.3d at p. 319) also notes that one obvious purpose of section 273.5 was to expand its predecessor section, a "wife-beating" statute (former § 273d), to protect the large numbers of couples who live as husband and wife, but without marriage (*Eldon* v. *Sheldon* (1988) 46 Cal.3d 267, 273 & fn. 3 [250 Cal.Rptr. 254, 758 P.2d 582]; *Marvin* v. *Marvin* (1976) 18 Cal.3d 660, 665 & fn. 1 [134 Cal.Rptr. 815, 557 P.2d 106]).

*Ballard* thus construes cohabiting for purposes of section 273.5 as covering any "significant relationship"—one limited by the section itself to a man and woman living together—and finds support in the fact that case law has not uniformly defined "cohabiting" as requiring de facto marriage. We further note that the common, nonlegal understanding of "cohabit" also covers either living together as husband and wife *or* simply living together. (Webster's Third New Internat. Dict. (1965) p. 440; Webster's New Collegiate Dict. (7th ed. 1970) p. 161.)

Defendant would have us hold that cohabiting has one rigid meaning—that being the mutual assumption of marital rights, duties and obligations usually manifested by married people, though not necessarily dependent on sexual relations. Such a definition, drawn from a law review article, was noted in *In re Marriage of Thweatt* (1979) 96 Cal.App.3d 530, at page 534 [157 Cal.Rptr. 826], prefatory to the court concluding that a mere "boarding house arrangement" between a man and woman was not enough to trigger Civil Code section 4801.5's rebuttable presumption of reduced need for spousal support. However, the court's actual holding was only that the word " 'cohabiting' . . . carries more meaning than two persons of the opposite sex living under one roof" (*id.,* at p. 534), and the court found nothing in the evidence beyond "cohabitation of a nonsexual platonic nature" (*ibid.*). More importantly, the statute in *Thweatt* was designed in part to prevent a supported spouse from "remarrying" in fact, though not in law, and then claiming needs as though the relationship did not exist. The domestic-violence-deterrent purpose behind section 273.5, by contrast, does not need a formal, quasi-marital relationship to come into play.

Thus, we reject the idea that *Thweatt* represents an inflexible legal definition of "cohabiting" that applies to all statutes. Moreover, if it did, then statutory phrasing such as "freely cohabited . . . *as husband and wife*" (Civ. Code, § 4425, subd. (c), italics added) would be redundant.

We do think that section 273.5 requires something more than a platonic, rooming-house arrangement. *Ballard* speaks of a "significant relationship" by analogy to the domestic violence act provisions. (*Ballard, supra,* 203 Cal.App.3d 311, 318.) Because those provisions appear limited to amorous and/or sexually intimate relationships (§ 13700, subd. (b)), it is logical to ascribe a similar limitation to section 273.5. Section 273.5's requirement of a man-woman relationship further supports this view. Thus, we reject defendant's concern that viewing "cohabiting" as anything less than a quasi-marital relationship would broadly encompass all men and women who live together, including sisters and brothers, or boarders.

There is a further, practical reason for construing the statute this way. While, unlike the instant case, there will be borderline situations in which

the existence of the requisite "significant relationship" may be difficult for law enforcement or jurors to ascertain, the problems would be multiplied many times over if the test were whether a full quasi-marital relationship existed. Recently, in holding that a cause of action for negligent infliction of emotional distress should be limited to married couples, the Supreme Court noted that extending recovery to unmarried cohabitants "would impose a difficult burden on the courts. It would require a court to inquire into the relationship of the partners to determine whether the 'emotional attachments of the family relationship' existed between the parties [citation], and whether the relationship was 'stable and significant' [citation]. . . ." (*Eldon* v. *Sheldon, supra,* 46 Cal.3d 267, 275-276.) Rejecting the idea that "the stability of a cohabitation relationship could be established by evidence of its duration, whether the parties had a contract, the degree of economic cooperation, the exclusivity of sexual relationships, and whether the couple had children" (*id.,* at p. 276), the court responded: "In *Norman* v. *Unemployment Ins. Appeals Board* [1983] 34 Cal.3d 1, 8-10 [192 Cal.Rptr. 134, 663 P.2d 904], we commented on the 'difficult problems of proof' involved in determining whether a relationship is equivalent to a marriage. Authorities in this state and elsewhere have rejected [such a] test as inviting 'mischief and inconsistent results.' [Citations.] [¶] A determination . . . based on such matters as the sexual fidelity of the parties and their emotional and economic ties would require a court to undertake a massive intrusion into the private life of the partners. *Further, application of these factors would not provide a sufficiently definite and predictable test to allow for consistent application from case to case.*" (*Ibid.,* italics added.) Problems of definiteness, predictability and consistent application, of course, are vital considerations in the context of the vagueness arguments asserted here. A police officer, district attorney, court and jury will have far less trouble determining whether a significant live-together relationship exists than determining whether the relationship is quasi-marital, particularly when there exists such uncertainty over which rights, duties and obligations of marriage are *ordinary* in our society.

■    Therefore, "cohabiting" under section 273.5 means an unrelated man and woman living together in a substantial relationship—one manifested, minimally, by permanence and sexual or amorous intimacy. That definition accords with the common, broad understanding of "cohabiting" except for the limitation, implied from the man-woman restriction on the face of the statute, that the couple must be unrelated and living in sexual or amorous intimacy. This definition gives sufficiently definite warning to the offender and guidelines for law enforcement to satisfy the state and federal Constitutions. The statute thus is not facially invalid.

## II

■ It follows from our discussion in part I that the trial court correctly instructed the jury with this definition of its own devising: "Cohabitation is defined as follows.

"It is the living together under the same roof of unrelated adult persons of the opposite sex for a substantial period of time, resulting in some permanency of relationship.

"Factors you may consider in determining whether or not persons are cohabit[ing] include, but are not limited to: 1. Sexual relations between the parties while sharing the same living quarters.

"2. Sharing of income or expenses.

"3. Joint use or ownership of property.

"4. Whether the parties hold themselves out as husband and wife.

"5. The continuity of the relationship.

"6. The length of the relationship."

The instruction's use of the phrase "substantial period of time, resulting in some permanency of relationship" accords with what we have said in part I, with *Ballard's* "significant relationship" language and with the dictionary definition of cohabiting. The six enumerated factors, being nonexclusive, are also consistent with common understanding and probable legislative intent.

We do not share defendant's concern that this instruction, by telling jurors that they "may" consider the enumerated factors, allowed jurors to make up their own definition of cohabiting and even to find that living under the same roof was enough alone. *Before* listing those factors, the instruction limits the definition to "living together under the same roof [by] unrelated adult persons of the opposite sex for *a substantial period of time, resulting in some permanency of relationship.*" (Italics added.) The jury clearly had to find the underscored language applicable *in addition to* finding a living together under the same roof, and the listed factors would reasonably have been understood as advisory guidelines for determining when "permanency of relationship" is present. While the instruction might have included further guidelines, it was sufficiently definite. Defendant acknowledged at oral argument herein that the instruction was a good

attempt by the trial court, and the record does not reflect that defendant asked for and was refused modification of its factors.

Defendant's proposed alternate instruction, which would have defined cohabitation as "the mutual assumption of marital rights, duties, and obligations that are usually manifested by married people, including but not necessarily dependent on sexual relations" (cf. *In re Marriage of Thweatt, supra,* 96 Cal.App.3d 530, 534), was properly refused as too restrictive a definition. (Cf. *Ballard, supra,* 203 Cal.App.3d 311, 319.)

### III

██ In light of our conclusion that a full quasi-marital relationship is not required for "cohabiting" under the section, we reject defendant's contention that substantial evidence is lacking in the record. Applying the familiar principles of substantial evidence review and thus assuming that the jury resolved factual conflicts against defendant (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303-304 [228 Cal.Rptr. 228, 721 P.2d 110]; *People* v. *Towler* (1982) 31 Cal.3d 105, 117-119 [181 Cal.Rptr. 391, 641 P.2d 1253]), we find substantial evidence in Ms. Andres's testimony.

It appears that defendant lived with her at the hotel half or more of the three months preceding the assault and had no other regular place to stay. When there, he slept and had occasional sex with her, although he ate few meals there and often went out alone evenings after work. He brought his few belongings with him each time he returned to her. They did not share rent, a bank account or the cost of furnishings, but that is not surprising considering their meager resources, few belongings and cramped quarters. Such sharing is not essential in any event. The jury could have felt that the fact that rent was not shared *refuted* the idea that their relationship was one of convenience only. The sex, though infrequent, and Andres's romantic feelings for him, though unreturned, show an intimacy going well beyond that of ordinary roommates. Finally, the jury could reasonably have found an ongoing relationship of "some permanency" under the guidelines given them. In *Ballard,* sufficient permanency was found where the defendant maintained his own apartment throughout the time; the parties were " 'together a lot' " and " 'lived together in one bed' " at her residence. (*Ballard, supra,* 203 Cal.App.3d 311, 314.) Here it appears that defendant and his victim shared quarters to an even greater degree in that defendant had no other place to stay most of the time.

## DISPOSITION

The judgment is affirmed.

Kline, P. J., and Pollak, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied February 16, 1989.

---

* Assigned by the Chairperson of the Judicial Council.