[No. C055046. Third Dist. Nov. 18, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIE BELTON, Defendant and Appellant.

COUNSEL

Madeline McDowell, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and John A. Bachman, Deputy Attorneys General, for Plaintiff and Respondent.

**O**PINION

DAVIS, Acting P. J.—A jury convicted defendant Willie Belton of corporal injury to a former cohabitant (Pen. Code, § 273.5, subd. (a))[1] with an enhancement for personally inflicting great bodily injury (§ 12022.7, subd. (e)), and felony battery with serious bodily injury (§ 243, subd. (d)). The jury sustained two strike priors and three prior prison term allegations and the court sentenced defendant to 25 years to life plus seven years.

On appeal, defendant contends there is insufficient evidence supporting his conviction of corporal injury to a cohabitant; the court incorrectly instructed the jury on the elements of the lesser included offense of misdemeanor battery against a cohabitant, spouse, or person in a dating relationship; there is insufficient evidence to support the conviction for felony battery with serious bodily injury; and the prosecutor committed prejudicial misconduct in the closing argument. We shall reject the contentions and affirm.

### BACKGROUND

Christine B. started a relationship with defendant in February 2005. They were intimate with each other and started to live together, sharing the room Christine had been living in when they met. Upon being kicked out of the room, Christine and defendant "were pretty much homeless after that, staying in motels and maybe with a cousin or nephew of his or something." They took their meals together, and since defendant had no income, Christine covered all of their expenses. She would buy things for defendant as well as herself and they would occasionally shop together.

The relationship ended in April 2005. At the time, Christine and defendant were sleeping together in a car parked next to her friend Lynetta's house. Lynetta was willing to let Christine live inside her house, but was uncomfortable having a stranger (defendant) sleep inside. Christine chose to sleep in the car with defendant rather than use Lynetta's house by herself. However, defendant was allowed to bathe, watch television, and eat at Lynetta's house.

The relationship ended over defendant's drug use, his disappearing for days at a time, and his inability to help Christine as she looked for a home and job. One day, defendant drove up in a car with two passengers, another man and a woman, and asked Christine for his belongings. Defendant took his things and left peacefully.

---

[1] Hereafter, undesignated section references are to the Penal Code.

Christine testified that she was not in love with defendant and barely knew him. She stated that there were two instances in which there was violence in the relationship. In the first, defendant grabbed her by the throat after she asked him if he was taking drugs again. She could not remember the specifics of the second, except that it "most likely had to do with his drug abuse." Defendant also threatened her once while they were together—he told Christine that he would kill her if he ever caught her walking on Del Paso Boulevard with another man.

On May 6, 2005, after defendant and Christine had ended their relationship, Christine was on Del Paso Boulevard to meet Ronnie, a male friend. (The two later became romantically involved.) Christine described Ronnie as a "mutual friend."

Christine saw Ronnie from 10 to 15 feet away. As she walked toward him, defendant grabbed Christine's shoulder from behind and turned her around, saying, "I—I told you. What are you doing here, bitch?" Christine, confused, asked to be let go, but defendant grabbed her by the hair and the right side of her face and slammed the other side of her head three times into a brick wall.

Ronnie approached the two and held defendant, telling him to calm down, which allowed Christine to break away and start to cross the street. Defendant struck Ronnie, knocking him to the ground, then ran to Christine and pulled her across the street by her hair and her arm.

Christine tried to pull away from defendant. Defendant punched her in the mouth, which caused her to lose part of a tooth. He also punched her on the side of her head "maybe twice." Christine fell to the ground from the force of the blows and the pain of the lost tooth. She got into a fetal position and defendant kicked her and stomped on her arm. At some point, Ronnie ran up and pushed defendant off of her, allowing Christine to escape and call the police.

Christine talked to the police before going to the hospital. She got stitches, but was unsure how many. Christine thought she had four to five stitches in her eyebrow and stitches on two parts of her mouth. Part of one tooth was knocked out to the root.

The police sergeant who responded to the incident observed Christine was crying; she had a lot of blood around her face and a split lip, with much blood dripping from her lip. She had a "pretty big" lump on the left side of her head and swelling along the left side of her face and jawline.

The emergency room physician diagnosed Christine with multiple contusions after an assault and multiple lacerations that required sutures. Christine also had a bruise on her right shoulder, swelling in the right posterior pelvic area, bruising on the right arm, and a fractured front tooth as a result of the assault.

Gwendolyn S. testified regarding an uncharged prior assault by defendant. In 2003, Gwendolyn and defendant lived together as boyfriend and girlfriend for less than a month. In June 2003, Gwendolyn and defendant were in the bedroom. Defendant asked Gwendolyn for the keys to her car. She refused, turned the light off, and went to bed. Defendant asked her to move over so he could get into bed with her. She refused and felt a punch and saw "stars." Defendant punched her three times with a closed fist—once in the jaw, and once on each eye.

The defense called Ronnie, who claimed that he did not see defendant or Christine on May 6, 2005, and did not witness the incident.

Early in the proceedings, defendant entered a plea of not guilty by reason of insanity. The jury heard evidence on the issue and rejected the defense.

## DISCUSSION

### *I*

■ Section 273.5, subdivision (a), provides in pertinent part that any person who willfully inflicts "corporal injury resulting in a traumatic condition" upon a "cohabitant" or "former cohabitant" is guilty of a felony. Defendant contends the evidence is insufficient to support a finding that he and Christine were or ever had been cohabitants. We disagree and find substantial evidence that defendant was a former cohabitant at the time of the offense.

In reviewing a challenge to the sufficiency of the evidence, we examine the record in the light most favorable to the judgment to see if it contains reasonable, solid evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].)

The cases addressing the cohabitation element of section 273.5 "have interpreted it broadly, refusing to impose any requirement of a 'quasi-marital relationship.' " (*People v. Moore* (1996) 44 Cal.App.4th 1323, 1333 [52

Cal.Rptr.2d 256].) For purposes of section 273.5, the term "cohabitant" "requires something more than a platonic, rooming-house arrangement." (*People v. Holifield* (1988) 205 Cal.App.3d 993, 999 [252 Cal.Rptr. 729] (*Holifield*).) It refers to an unrelated couple "living together in a substantial relationship—one manifested, minimally, by permanence and sexual or amorous intimacy." (*Id.* at p. 1000.) A permanent address is not necessary to establish cohabitation, as cohabitation can be found even in "unstable or transitory" living conditions. (*People v. Taylor* (2004) 118 Cal.App.4th 11, 19 [12 Cal.Rptr.3d 693].)

Defendant contends his relationship with Christine was neither permanent nor long enough to qualify as cohabitation under the statute. We disagree.

In *Holifield*, according to the victim, the defendant came and went from her "sleeping room" in a motel over a three-month period, but had stayed with her continuously for the two weeks before his assault on her. (*Holifield, supra*, 205 Cal.App.3d at pp. 995–996.) The couple had "occasional sexual relations" and the victim "care[d] about [defendant]." (*Id.* at p. 996.) The Court of Appeal found that "[i]t appear[ed] that defendant lived with [the victim] at the [m]otel half or more of the three months preceding the assault . . . ." (*Id.* at p. 1002.) Although they did not share rent, a bank account, or the cost of furnishings, this was to be expected given their meager resources. (*Ibid.*) While the defendant in *Holifield* only occasionally shared meals with the victim when they were together, the infrequent sex and unrequited affection from the victim "show[ed] an intimacy going well beyond that of ordinary roommates." (*Ibid.*) The Court of Appeal held that this was enough for the jury to properly find a relationship of " 'some permanency' " under the statute. (*Ibid.*)

Christine did not specify the portion of the two-month relationship with defendant in which they lived together. She did testify that they lived together at the place they first met, the house where she had been renting a room. Once they were thrown out of the house, they continued to live together, in friends' houses, motels, or a car. They also shared their meals and shopped together on occasion. Because defendant had no income, Christine paid their living expenses. Christine even chose to sleep with defendant in a car rather than sleep in her friend's house because defendant was not welcome to sleep in the house. Although she claims not to have loved him, defendant and Christine had sexual relations during their time together. This

is ample evidence to establish "some permanency" to support a conviction under section 273.5.

## II

The jury was instructed on the lesser included offense of battery in violation of section 243, subdivision (e)(1). Using CALCRIM No. 841, the court's instruction stated the elements of the crime were that defendant willfully and unlawfully touched Christine "in a harmful or offensive manner" and Christina is "defendant's former cohabitant *or* had a former dating relationship." The court's instruction did not include the statute's definition of former dating relationship.

Defendant contends the instruction was improper because the offense does not apply to battery against a *former* cohabitant unless the former cohabitant also meets one of the categories listed in the statute. Here the relevant category would have been "former dating relationship," a term the court failed to define for the jury.

■ As defendant correctly points out, section 243, subdivision (e)(1) does not list former cohabitant as a separate category of offender. (§ 243, subd. (e)(1).) Since the offense does not apply to former cohabitants without the former cohabitant falling within one of the statutorily listed categories, such as "former dating relationship," the instruction is incorrect.

Here the erroneous instruction did not prejudice defendant. The error benefitted defendant. As given, CALCRIM No. 841 made it easier for the jury to convict him of the lesser included offense rather than the charged crime. Even with this benefit, the jury convicted defendant of the principal offense. And, as we have already discussed, there is ample evidence to support defendant's conviction of the principal offense of corporal injury to a former cohabitant.

## III

Defendant contends there is insufficient evidence of serious bodily injury to support his conviction for felony battery with serious bodily injury. We disagree.

■ Section 243, subdivision (d), establishes the crime of battery involving serious bodily injury. In subdivision (f)(4) of section 243, " '[s]erious bodily injury' " is defined as "a serious impairment of physical condition,

including, but not limited to, the following: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement." (§ 243, subd. (f)(4).)

Defendant contends that a broken tooth is not the same as a broken bone, and as a matter of law should not be considered a serious bodily injury. Subdivision (f)(4) of section 243 provides that the "impairment[s] of physical condition[s]" that constitute "serious bodily injury" "includ[e] but [are] not limited to" the list that follows; in other words, the list is not exclusive. As a result of defendant's attack, Christine lost a tooth up to its root. Because she lacked insurance, she could not replace the tooth, which altered her appearance and prevented her teeth from being fully functional. Her wounds required sutures on one eyebrow and two places on her mouth. Taken together, this represents sufficient "serious impairment of [her] physical condition" to support a conviction for battery with serious bodily injury.

## IV

At the beginning of his closing argument, the prosecutor made the following statement: "All right. I'm not going to speak to you very long at this point because I submit to you this case is fairly simple as it sits before you at this point. Although [defendant] has a constitutional right to a jury trial, he does not have a constitutional right to a good defense."

Defendant's objection was overruled and the prosecutor continued: "You see [defense counsel] is a very professional, skilled attorney in this case. If there were a good defense, I'm sure you would have heard about it. There really isn't [one]. There isn't any."

Defendant contends the prosecutor committed reversible misconduct by improperly denigrating defense counsel, shifting the jury's focus from the evidence to counsel. We disagree.

■ " 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or

reprehensible methods to attempt to persuade either the court or the jury." ' " [Citation.] . . . Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Ochoa* (1998) 19 Cal.4th 353, 427 [79 Cal.Rptr.2d 408, 966 P.2d 442], quoting *People v. Samayoa* (1997) 15 Cal.4th 795, 841 [64 Cal.Rptr.2d 400, 938 P.2d 2].)

"It is generally improper for the prosecutor to accuse defense counsel of fabricating a defense [citations], or to imply that counsel is free to deceive the jury [citation]." (*People v. Bemore* (2000) 22 Cal.4th 809, 846 [94 Cal.Rptr.2d 840, 996 P.2d 1152] (*Bemore*).) Such arguments are inappropriate, as they attack opposing counsel's credibility and risk "focusing the jury's attention on irrelevant matters and diverting the prosecution from its proper role of commenting on the evidence and drawing reasonable inferences therefrom." (*Ibid.*)

Nevertheless, a prosecutor "is entitled both to discuss the evidence and to comment on reasonable inferences that may be drawn therefrom." (*People v. Morales* (2001) 25 Cal.4th 34, 44 [104 Cal.Rptr.2d 582, 18 P.3d 11].) The prosecutor is accorded "wide latitude in describing the deficiencies in opposing counsel's tactics and factual account." (*Bemore, supra*, 22 Cal.4th at p. 846.) For example, it is not misconduct for a prosecutor to accuse counsel of making an " 'irresponsible' " third party culpability claim. (*People v. Frye* (1998) 18 Cal.4th 894, 978 [77 Cal.Rptr.2d 25, 959 P.2d 183].) A prosecutor may also criticize the defense theory of the case for lacking evidentiary support. (*People v. Fierro* (1991) 1 Cal.4th 173, 212 & fn. 9 [3 Cal.Rptr.2d 426, 821 P.2d 1302] (*Fierro*).)

Here, the prosecutor's comments "did not cross the line of acceptable argument." (*Fierro, supra*, 1 Cal.4th at p. 212.) In the context of the argument, the prosecutor was complementary to defense counsel's skills while permissibly characterizing the defense itself as weak. In doing so the prosecutor merely alluded to the reality defense attorneys face when their client's case is weak. In addition, "we perceive no realistic likelihood that it prejudiced defendant." (*Id.* at p. 213.)

## Disposition

The judgment is affirmed.

Nicholson, J., and Hull, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 11, 2009, S168896. Werdegar, J., did not participate therein.