Filed 2/23/15  P. v. Pink CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>MATTHEW JAMES PINK,<br><br>      Defendant and Appellant. | G050424<br><br>(Super. Ct. No. SWF1202953)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Riverside County, Dennis A. McConaghy, Judge.  Affirmed.

Richard Power, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Robin Urbanski, and Alastair J. Agcaoili, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Matthew James Pink of corporal injury on a cohabitant (Pen. Code, § 273.5, subd. (a); all further statutory references are to the Penal Code unless otherwise noted), assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)), felony false imprisonment (§§ 236, 237), dissuading a witness (§ 136.1, subd. (b)(1)) and willful infliction of pain and suffering on a child (§ 273a, subd. (b)). Defendant admitted four prison priors (§ 667.5, subd. (b)) and one strike prior (§ 667, subds. (c), (e)(1)). The court denied defendant's motion to dismiss the strike prior for sentencing purposes (*People v. Superior Court* (*Romero*) 13 Cal.4th 497 (*Romero*)) and sentenced him to 12 years.

Defendant challenges the sufficiency of the evidence to prove he and the victim were cohabitants, that he used force likely to produce great bodily injury, or used violence and/or menace to commit false imprisonment. He also claims the trial court abused its discretion by admitting evidence of a 1999 act of domestic violence (Evid. Code, § 1109) and denying his *Romero* motion to dismiss his prior in the interests of justice. We conclude sufficient evidence supports the jury's verdict. Moreover, the trial court properly exercised its discretion by admitting evidence of the 1999 incident and by denying defendant's *Romero* motion. Therefore, the judgment is affirmed.

## FACTS

Jane Doe 1 and defendant met in 2005 or 2006. They met again in January 2012. Within a week of this meeting, Doe 1 and defendant were taking turns sleeping at defendant's house and Doe 1's apartment. Doe 1, shared her apartment with her two young daughters. She described defendant as "charming," and their relationship "exciting," and she said her two young girls seemed to enjoy his attention. However, Doe 1 also testified defendant abused alcohol and drugs, and that alcohol made defendant verbally and physically abusive.

In March, defendant forced Doe 1 to have anal sex. He was intoxicated at the time and sleeping at Doe 1's apartment. The incident drew the attention of one of

2

Doe 1's daughters. The girl pounded on the bedroom door and screamed, "Stop. What are you guys doing in there? Stop." Defendant yelled at the girl and told her to go back to bed. The next morning, defendant and Doe 1 told her daughter that defendant was giving her a massage the night before.

Some days later, defendant, Doe 1, and both girls were at a party at defendant's house. During the party, defendant ordered Doe 1 to go inside the house. When Doe 1 complied, defendant grabbed her hair and pulled off her clothing. He tried to force her to have anal sex, but Doe 1 was able to push him away.

Defendant and Doe 1 became engaged in April. Defendant moved some of his belongings into Doe 1's apartment. At defendant's request, Doe 1 permitted him to sign her lease agreement. Nevertheless, one day in early April, defendant shoved Doe 1's head into a car window while he was driving and Doe 1's children were in the car. When they arrived at their destination, defendant forcibly pulled Doe 1 out of the car. With Doe 1's girls a few feet away, defendant held Doe 1 against the car, pushed his face close to hers, and yelled, "Fucking bitch. I hate you. You're just like Zulma, a fucking cunt. I'm going to kill myself. Is that what you want? You want me to kill myself. Come on. I'm going to kill myself right now. Fucking bitch. It's going to be all your fault. Come on. I'm going to kill myself. Let's go in the house. I'm going to kill myself right now." Defendant dragged Doe 1 into the house and started rifling through drawers and bags in an apparent search. When Doe 1's children came into the house, defendant seemed to calm down.

In June, the day before his sister's wedding, defendant decided to mix alcohol and the contents of three or four bottles of Doe 1's prescription medications. Defendant told Doe 1 he intended to kill himself. Defendant did not die, but he did wake up and slap Doe 1 in the face. At the wedding reception, defendant argued with Doe 1 and forced her to stand by him. Nevertheless, Doe 1 slipped away from the reception, and she spent the night at the home of her friend, Jimmy Castillo.

3

Very early the following morning, Castillo, awoke to hear defendant pounding on his front door, yelling obscenities, and calling for Doe 1. Castillo grabbed his shotgun and went to the door. When Castillo opened the door, defendant burst through and asked, "Where's my girlfriend at? I know she's here." Defendant then saw Doe 1 standing behind Castillo in a T-shirt and shorts. Defendant asked Doe 1 to come with him, but Doe 1 said no. Castillo made defendant step outside. Defendant crumpled to his knees and cried. He threatened to kill himself and begged Doe 1 to come with him because "I crashed my car."

Doe 1 went with defendant and they drove to defendant's house. Doe 1 testified defendant was angry. He pulled off her jacket and T-shirt, and hit her in the head. When they arrived at their destination, defendant had some trouble releasing the ignition key. He became enraged, hit the steering wheel, and started to smell various parts of Doe 1's body. When they finally went inside the house, defendant, who was already intoxicated, started to drink beer. Later that night, he dragged Doe 1 to his car. He blamed Doe 1 for totaling his car, something he had done. He grabbed and smashed Doe 1's cell phone when she tried to call her mother, and he later forced her to have anal sex.

Around July 20, Doe 1 damaged one of defendant's shirts. Defendant used his left forearm to place Doe 1 in a headlock. He constricted Doe 1's airway until she nearly passed out.

On the night of July 22, defendant waited at their apartment for Doe 1 to come home from work. When she entered the apartment, Doe 1 complained because she had been unable to contact defendant by phone. She was also upset because defendant had taken a picture of one of her daughters in her bathing suit by the pool that day. Doe 1 told defendant she did not want to argue and she started to walk away. Defendant came up behind Doe 1, used his left arm to put her into a headlock, and he squeezed. Defendant used the headlock to drag Doe 1 from the kitchen into the living room. Doe 1

4

struggled while defendant used his weight to pull Doe 1 onto the couch. He then pinned her down with his legs and put his hand over her mouth.

Doe 1 was having difficulty breathing and she started to feel dizzy when her 10-year-old daughter, Jane Doe 2, came out of her bedroom. Doe 2 yelled, "Let go of my mom." Defendant released his grip on Doe 1's throat, threw her down to the floor, and chased after Doe 2. Doe 1 tried to reach a cell phone while defendant chased her daughter into the kitchen. Doe 1 heard loud thumps coming from the kitchen as her daughter yelled, "Let go of me. Let go of me. Give me my phone. I'm calling the police." She also heard defendant say, "You're not calling the police. I told you, you don't get involved in grownup stuff. Get away from here. Go to your room."

Doe 1 eventually found a phone and dialed 911 from her bedroom. She accidentally dropped the phone on the bed when defendant burst in. He followed her to the master bathroom. The voice of the 911 operator became audible and defendant told Doe 1 to be quiet. Then he kicked Doe 1 and punched her in the head. Doe 1 testified she feared for her life.

Doe 2 came into the bathroom and punched defendant. He pushed Doe 2. Defendant told Doe 2 "to mind her own business." Doe 2 yelled back, "You're not my dad anymore." Defendant grabbed Doe 1 and forced her downstairs. He told her to cancel the previous 911 call and tell the 911 operator "it wasn't that serious." Five minutes later, police officers arrived.

Doe 1 suffered bruises and scratches on her arms and injuries to her neck and shoulder. She threw up during the incident and was in pain for a few months.

*Prior Acts Evidence*

Jane Doe 3 met defendant in 1997. She dated him for two years. In May of 1999, Doe 3 decided to breakup with defendant. The first time Doe 3 mentioned she wanted to breakup, defendant became noticeably upset. The second time, he inflicted serious injuries on her.

5

According to Doe 3, defendant drove to the home she shared with her two-year-old daughter. Doe 3 also mentioned that she had a new romantic interest. Defendant demanded to know where Doe 3's new boyfriend lived. Doe 3 refused to give defendant any information. Defendant yelled and cursed. He picked up Doe 3's daughter and took her to his car.

Doe 3 grabbed her daughter and an argument started. Defendant hit Doe 3 over 10 times. Once, he punched her in the face with a closed fist. Doe 3 turned her back to defendant to protect herself and her daughter, but defendant continued to hit her. A neighbor, Romelia Alonzo, approached defendant with a gardening tool in an effort to subdue him. Defendant tried to take the tool way from Alonzo. When he found he could not gain control of the tool, defendant punched Alonzo in the forehead and drove away. His punch caused Alonzo to suffer significant blood loss and a cut to her forehead that required 21 stitches to close. Doe 3 suffered a broken orthodontics and bumps on her head.

Defendant was violent from the beginning of his relationship with Doe 1. Nevertheless, Doe 1 stayed in the relationship. She expressed a reluctance to leave because she loved defendant and his family. The People's domestic violence expert testified Doe 1's reluctance to leave defendant is consistent with behavior displayed by other domestic violence victims.

*Defense*

Defendant called Zulma Acosta, a former girlfriend, to testify on his behalf. They lived together for four or five months between August 2011 and April 2012. She testified defendant was not violent to either her or her children. She also described Doe 1 as a bitch.

Defendant also called his sister, Julieanne Mendoza. Mendoza testified she received a call from defendant late at night on July 22, 2012. He asked her to pick him up at Doe 1's apartment. Mendoza heard Doe 1 apologizing to defendant and begging

6

him to stay. By the time she got to Doe 1's apartment, police officers were leaving the scene. Mendoza testified that Doe 1 "was completely fine," although Doe 1 was crying. Mendoza saw nothing out of place in the home, except she admitted she was not really looking for anything to be wrong.

Mendoza kept Doe 1's youngest daughter overnight while Doe 1 accompanied Doe 2 to the hospital. The next morning Doe 1 returned for her daughter. Mendoza said Doe 1 had no visible injuries. She described her defendnat's relationship with Doe 1 as "lovey-dovey," and she had never noticed any injuries on Doe 1's body, including during her June wedding and a July family trip.

## DISCUSSION

*1. Prior Acts Evidence*

Prior to trial, the People moved to admit evidence defendant had been the aggressor in four separate incidents of domestic violence. Three of those incidents were identified as the charged crimes against Doe 1 and Doe 2. The fourth incident was the May 1999 incident involving Doe 3 which is described in the statement of facts above. As described in the People's motion defendant assaulted Doe 3, his ex-girlfriend, and a neighbor who tried to intervene. Defendant and Doe 3 had been dating two years when she decided to end the relationship. One day, while Doe 3 and defendant were standing in front of her home and she was holding her two-year-old child, defendant started to repeatedly punch Doe 3. When Doe 3 turned away from defendant to protect her child, he repeatedly hit her in the back of the head.

In response, defendant moved to exclude the 1999 incident on the grounds that it was too remote and the facts too inflammatory for the evidence to be admitted. (Evid. Code, § 352.) After considering the arguments of counsel, the trial court denied the defense motion to exclude. The court acknowledged the remoteness of the prior conduct, but found good cause to admit the evidence, pointing to the similarities in the July 22 incident with Doe 1 and the 1999 incident with Doe 3. Furthermore, the court

7

found the probative value of the evidence outweighed the prejudicial effect of the evidence.  Defendant argues the court abused its discretion.  We disagree.

Except as provided by statutes such as Evidence Code section 1109, "evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion."  (Evid. Code, § 1101, subd. (a).)  To the extent allowed by Evidence Code section 352, prior acts of domestic violence are admissible in a criminal action "in which the defendant is accused of an offense involving domestic violence."  (Evid. Code, § 1109, subd. (a)(1).)  However, "[e]vidence of acts occurring more than 10 years before the charged offense is inadmissible under this section unless the court determines that the admission of this evidence is in the interest of justice."  (Evid. Code, § 1109, subd. (e).)

The 1999 incident occurred more than 10 years before July 12, 2012 and is, therefore, subject to the presumption of inadmissibility.  The court stated similarity was the primary factor in its determination admission of the 1999 incident was in the interest of justice.  "'"The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense."'  [Citation.]"  (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531-532 (*Johnson*).)

In *Johnson*, the defendant lived with the victim and her two sons.  The defendant's drug addiction and threats of violence prompted the victim to separate from the defendant.  The defendant repeatedly threatened to kill the victim, however she agreed to meet him in a parking lot to collect some of her belongings.  When she arrived, defendant shot her in the arm and back.  The propensity evidence consisted of two prior incidents where the defendant threatened to kill his romantic partner, became intoxicated, and then shot her.  The two priors were remote, one 20 and the other 16 years before the current crime, but the trial court admitted them into evidence.

The appellate court concluded the highly probative value of the prior acts outweighed a low risk of prejudice.  (*Johnson, supra,* 185 Cal.App.4th at pp. 533-534.)

With respect to the defendant's claim the prior acts evidence was too remote in time to admit, the *Johnson* court found the probative value of the prior cases was great. "In each of the prior cases defendant resorted to shooting his girlfriend when she either had decided to breakup with him or was actively engaged in an argument with him. Defendant's drug use was a factor in each incident, either in precipitating the breakup, or because defendant was under the influence at the time of the assault, or both." (*Id.* at p. 532.)

Here, the 1999 incident with Doe 3 is remarkably similar to the July 22 incident involving Doe 1 and Doe 2. In both cases defendant, while under the influence, became angry and violent when his current girlfriend expressed a desire to end the relationship. Both cases involve the defendant committing physical acts of violence on women while in close proximity to a small child. These similarities make the evidence highly probative.

However, that is not the end of the inquiry. "By its incorporation of section 352, section 1109, subdivision (a)(1) makes evidence of past domestic violence inadmissible only if the court determines that its probative value is 'substantially outweighed' by its prejudicial impact. We review a challenge to a trial court's decision to admit such evidence for abuse of discretion. [Citations.]" (*Johnson*, *supra*, 185 Cal.App.4th. at p. 531, fn. omitted.)

We conclude, as the trial court did, that the 1999 incident was no more inflammatory than the offenses for which defendant stood trial. Both incidents involved violence against women and children. Both seem to have been precipitated by feelings of insecurity aroused when defendant's girlfriends decided to end their relationships with him. Thus, the court correctly weighed the remoteness of the 1999 act of domestic violence and potential for prejudice of the prior acts against its probative value, and concluded evidence of the prior act of domestic violence was admissible. We find no abuse of discretion.

9

*2. Sufficiency of the Evidence*

Defendant challenges the sufficiency of the evidence to prove the cohabitation element for domestic violence, the force element in assault by means of force likely to cause great bodily injury, and the violence and menace elements of felony false imprisonment.

"'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1077; *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320.) The standard of review is the same in cases in which the prosecution relies on circumstantial evidence. (*People v. Snow* (2003) 30 Cal.4th 43, 66.)

*a. Infliction of Corporal Punishment on a Cohabitant*

Defendant first claims the evidence fails to prove he and Doe 1 were cohabitants. He argues the fact he always had another place to live and the relatively brief period of time he actually had his belongings in Doe 1's apartment (defendant says two days) equate to a relationship involved "two people with separate homes who were dating and [] sleeping back and forth," but not cohabitants. We disagree.

Cohabitation means "living together in a substantial relationship—one manifested, minimally, by permanence and sexual or amorous intimacy." (*People v. Holifield* (1988) 205 Cal.App.3d 993, 1000; *People v. Belton* (2008) 168 Cal.App.4th 432, 438; *People v. Moore* (1996) 44 Cal.App.4th 1323, 1333.) The term "cohabitation" has been broadly interpreted and does not require evidence of a "'quasi-marital'" relationship or a sexual relationship. (*Belton*, at p. 437; *Moore*, at p. 1333; *People v. Ballard* (1988) 203 Cal.App.3d 311, 319.) Furthermore, the defendant and the victim need not live together continuously to qualify as cohabitants within the meaning of

10

section 273.5. "The element of 'permanence' in the definition refers only to the underlying 'substantial relationship,' not to the actual living arrangement." (*Moore*, at p. 1334.) Cohabitation can be found even in "unstable or transitory" living conditions. (*People v. Taylor* (2004) 118 Cal.App.4th 11, 19.)

Here, the People provided evidence sufficient to sustain the jury's verdict. At the time of the assault, defendant and Doe 1 had been living together in a substantial relationship characterized by amorous intimacy for a few months. Although defendant also had another place to live, he moved some of his belongings into Doe 1's apartment, and insisted she permit him to sign her lease agreement. Together, defendant and Doe announced their April engagement, and he held Doe 1 out to be his fiancé at his family's functions. Moreover, defendant knowingly took on a parental role with Doe 1's two children by the time he moved in with Doe 1. This evidence is sufficient to prove defendant and Doe 1 cohabited. (See *People v. Holifield*, *supra*, 205 Cal.App.3d at p. 1002.)

### b. Assault by Means of Force Likely to Produce Great Bodily Injury

Defendant next challenges the sufficiency of the evidence to prove he assaulted Doe 1 with force likely to cause great bodily injury. Defendant claims the July 22 incident was nothing more than a "domestic spat." He seems to argue the fact Doe 1 remains alive and was never unconscious is evidence he did not use deadly force. Although he admits using a headlock, he claims he did so merely to attain her compliance, not to render her unconscious. We are not persuaded.

For purposes of assault by means of force likely to produce great bodily injury, "whether the victim in fact suffers any harm is immaterial." (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028.) "Great bodily injury is bodily injury which is significant or substantial, not insignificant, trivial or moderate. [Citations.]" (*People v. Covino* (1980) 100 Cal.App.3d 660, 668 (*Covino*).)

11

However, actual infliction of great bodily injury is not an element of assault by means of force likely to produce great bodily injury.  (*People v. Parrish* (1985) 170 Cal.App.3d 336, 343.)  There need not be extensive injuries.  (*People v. Hahn* (1956) 147 Cal.App.2d 308, 311.)  Rather, the focus is on the force used, and whether it was likely to cause great bodily injury.  (*Parrish,* at p. 343.)  Although actual injuries are not an element of the offense, the degree to which a victim is injured may be probative of the amount of force used.  (See *People v. Duke* (1985) 174 Cal.App.3d 296, 302 (*Duke*); 1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against the Person, § 37, p. 824.)

Doe 1 does not appear to have suffered great bodily injury, although she testified to marks on her neck, and she had body pain from the attack for several months.  Doe 1's testimony, and that of her neighbor, Alonzo, supports a reasonable inference that the force of defendant's assault, the headlock, dragging, and choking was *likely* to produce great bodily injury.  (*Covino*, *supra*, 100 Cal.App.3d at pp. 667-668; see *People v. Bassett* (1968) 69 Cal.2d 122, 139.)

*c.  Felony False Imprisonment*

Defendant also asserts the People failed to prove the force he used violence or menace to hold Doe 1 against her will.  We disagree.

False imprisonment is unlawful restraint of another.  (§ 236.)  Criminal false imprisonment has degrees with the offense becoming a felony when the defendant uses violence or menace.  (§ 237.)  While "[f]orce is an element of both felony and misdemeanor false imprisonment[,] [m]isdemeanor false imprisonment becomes a felony only where the force used is greater than that reasonably necessary to effect the restraint. In such circumstances the force is defined as 'violence' with the false imprisonment affected by such violence a felony."  (*People v. Hendrix* (1992) 8 Cal.App.4th 1458, 1462.)  "'Menace'" is defined "'"as a threat of harm express or implied by word or act."'"  (*People v. Reed* (2000) 78 Cal.App.4th 274, 280.)  False imprisonment is a

felony if effected by either violence or menace. (*People v. Arvanites* (1971) 17 Cal.App.3d 1052, 1059-1060.)

Here, defendant had Doe 1 in a headlock, a strangle hold. Then, while she is gasping for breath, he dragged her across the apartment and into another room. He used his weight and strength advantage to hold Doe 1 down on the couch until he was ready to release her. Defendant contends "the force used was no more than that required to briefly hold Doe 1 on the couch." Not so.

Defendant used his forearm to place Doe 1 under control. The headlock allowed him to apply pressure to Doe 1's neck, controlling her movement and restricting her ability to breath. Headlock in place, defendant dragged Doe 1 from one room of her apartment to another, and he continued to restrain her while she struggled to free herself. This is sufficient evidence of violence to support the jury's verdict.

Defendant's reliance on *Duke*, *supra*, 174 Cal.App.3d 296 is unavailing. In *Duke,* the court considered the amount of force the defendant "actually exerted" pursuant to section 245. (*Duke*, at p. 303.) But here, we must determine whether defendant abused Doe 1 under "circumstances or conditions *likely* to produce great bodily harm or death." (§ 273a, subd. (a), italics added.) In this case, the facts support finding defendant used "force that is greater than the force reasonably necessary to restrain someone." (CALCRIM No. 1240.) In short, the jury could rationally infer defendant abused Doe 1 under conditions or circumstances likely to cause great bodily injury.

## 3. *Romero Motion*

The first amended information alleged defendant had four prior felony convictions, three for possession of a controlled substance and one for first degree burglary. Defendant admitted the truth of all prior conviction allegations, including the first degree burglary conviction.

Prior to the sentencing hearing, defendant had filed a motion to strike the burglary prior in the interest of justice. (§ 1385, subd. (a).) Defendant claimed his lifelong addiction to drugs and alcohol fueled his entire criminal history, which he downplays by characterizing it as "a series of low level offenses."

The court denied his motion. Defendant claims the denial of his motion constitutes an abuse of discretion. Again we disagree.

The abuse of discretion standard is deferential, but not meaningless. In essence, the abuse of discretion standard "asks in substance whether the ruling in question 'falls outside the bounds of reason' under the applicable law and the relevant facts [citations]." (*People v. Williams* (1998) 17 Cal.4th 148, 162.) Defendant bears the burden to show the court's ruling was arbitrary or irrational, and, absent such showing, there is a presumption that the court "'"acted to achieve the legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review."'" (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

Defendant is approximately 35 years old. In those 35 years, in addition to the felony convictions for the instant crimes, defendant has accumulated three drug-related felony convictions and one conviction for first degree burglary. For some time, he has also repeatedly inflicted violence and injury on women and children. He has yet to confront his problems with alcohol, as demonstrated by his statement to the probation officer that he only drinks beer twice a week and only when he gets home from work. Thus, he has yet to express any insight into his actions, and he has never shown remorse for his crimes.

Section 1385, allows the trial court to dismiss a strike prior for purposes of sentencing and in the interests of justice. (*Romero*, *supra*, 13 Cal.4th 497.) Defendant claims his case falls outside the spirit of the "Three Strikes" law. The trial court disagreed. On this record, defendant has failed to overcome the presumption the court's sentencing decision is correct.

14

## DISPOSITION

The judgment is affirmed.


THOMPSON, J.

WE CONCUR:


O'LEARY, P. J.


ARONSON, J.