Filed 6/28/24  P. v. Sanchez CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ALEJANDRO SANCHEZ,<br><br>        Defendant and Appellant. | A164179<br><br>(Contra Costa County<br>Super. Ct. No. 05001919273) |

Defendant and Appellant Alejandro Sanchez was charged, tried and convicted by a jury of contact with a minor for a sexual offense (Pen. Code[1] § 288.3, subd. (a)), meeting a minor for lewd purposes (§288.4, subd. (b)) and attempted lewd act on a child (§§ 288, subd. (c)(1), 664).  In a motion for new trial, Sanchez asserted he received ineffective assistance of counsel.  The superior court denied the motion, sentenced him to two years' probation and required him to register as a sex offender.

Sanchez timely appealed.  On appeal he raises two arguments.  First, he contends there was no evidence that he had contact with an actual minor, the offense he was charged with and on which the jury was instructed.

_____

[1] Except as otherwise specified, undesignated statutory references are to the Penal Code.

1

Second, he claims the trial court erred in denying his motion for new trial based on six alleged acts and failures to act by counsel that constituted ineffective assistance. We affirm the convictions for the reasons set forth below.

## BACKGROUND

### A. The Charges and the Preliminary Hearing

In April 2019, the district attorney filed a felony complaint charging Sanchez with the above-described offenses. On October 1, 2019, the superior court held a preliminary hearing.

The evidence presented at the preliminary hearing consisted of testimony by Darryl Holcombe, a senior inspector for the district attorney's office who supervised Contra Costa County's Internet Crimes Against Children Task Force (ICAC). Holcombe testified he was investigating on an online dating app called "Skout," posing as a 14-year-old girl named "Emily"; was contacted by Sanchez, who after hearing Emily was 14 years old, continued to message with "Emily" over two days about her looks, her sexual experience and his desires, arranged to meet her at a park in Martinez, arrived at the park in a vehicle, circled around the park as if looking for her and texted to ask what she was wearing. Holcombe detained Sanchez as he was driving away from the park and Sanchez identified himself, provided his phone number, which Holcombe identified as the one with which he (as "Emily") had been texting, and admitted to communicating with a 14-year-old girl named Emily.

Based on this evidence, the court held Sanchez to answer on all three charges. In doing so, the judge noted he had done "a little research" regarding "the law that relates to these various offenses and what role undercover police officers might play in these offenses." He stated that, in his

2

view, "the evidence here establishes each of the offenses to a strong suspicion."

Following the court's ruling, the district attorney filed a felony information again charging Sanchez with the same three offenses, including "contact with [a] minor for sexual offense."

## B. The Trial and Verdict

### 1. Opening Statements

After a jury was selected and sworn and the trial judge gave the jury preliminary instructions, counsel for the parties gave opening statements. Consistent with the preliminary hearing, the People's opening statement made clear that the case was based on interactions between Sanchez and Inspector Darryl Holcombe of ICAC, who was posing as a 14-year-old girl named "Emily," that began on an internet dating site called "Skout" and continued on something called "iMessage." The statement made clear that when Sanchez and Emily arranged to meet at a park, it was Holcombe with whom Sanchez was messaging, that "Emily . . . is not real," and that the charges are based on Sanchez's conduct and words, which were "very real."

Defense counsel's opening statement made plain that he understood this was the basis for the charges, referring repeatedly to Holcombe's "contact[s]" with Sanchez, Holcombe "groom[ing]" Sanchez using the "Emily . . . profile," the absence of evidence that Sanchez had any "unnatural prurient interest in children" and that Holcombe "led Mr. Sanchez down this road." The primary defense, to which Sanchez would testify, was that Sanchez knew or suspected he was being "catfished" and that "Emily" wasn't real, he thought someone was trying to set him up, and he "played along" because he "wanted to get to the bottom of it." Defense counsel told the jury Sanchez was a successful soccer coach who coached girls' teams and had

3

witnessed other coaches be targeted with sexual offenses as part of "soccer politics." The evidence would show he dated adult women and had no unnatural interest in children.

## 2. Evidence at Trial

### a. Inspector Holcombe's Testimony

The trial took place in September 2020, and the evidence was presented over two days. Inspector Darryl Holcombe was the People's first and only witness.

Holcombe had been a Concord police officer for eleven years and for the last nine years had been an inspector with the Contra Costa County district attorney's office. For the last seven years, he had worked with ICAC and conducted digital forensic examinations of mobile phones and computers. He was qualified as an expert on digital cell phone searches and forensics. ICAC is a federally funded task force that investigates online child sexual exploitation. It receives tips from electronic communications providers like Facebook, Google and Snapchat about online child pornography, enticement of a child and child sex tourism.

Skout is a dating app on which users set up an account verified by a phone number or email address, create profiles and can add pictures, a bio and a description of interests. It uses GPS to geolocate people to other users of the platform. Skout allows users to message each other and to send words, photographs and videos. Minors are not allowed on Skout, but Holcombe has received tips from Skout about minors accessing the platform and being sexually exploited, and he and other members of ICAC monitor it by creating undercover profiles depicting minors then waiting to be contacted by adults. In creating profiles, ICAC members use only real photographs that are not manipulated, which they obtain from, and use with the consent of, employees

4

of law enforcement agencies. They do not use photos that are risqué, such as minors wearing bathing suits or in stages of undress.

When using Skout in this way, Holcombe does not reach out and start chatting with users but waits until they contact him. He doesn't ask the people who reach out to him thinking he is a minor to send him risqué photos, but if they ask him if it is ok for them to send him one, he says yes.

When he uses a certain persona, such as "Emily," he always uses the same background information about her. For example, Emily is a 14-year-old freshman whose parents are divorced, has an older sister, plays soccer and is sexually inexperienced. She attends College Park school in Pleasant Hill. Soon after someone contacts Emily, he identifies her age as 14, and most of the time they say they don't want to chat. Other ways he indicates that Emily is a minor include talking about the school she goes to, what grade she is in, that she is too young to drive, that her older sister is 17 and that her mom is really strict.

On January 3, 2019, Holcombe logged onto Skout as Emily. A person named Alejandro Sanchez, whose profile name was "Al," reached out to him. Holcombe later met Sanchez in person and identified the defendant as Sanchez. Exhibit 2, which was authenticated by Holcombe and admitted at trial, is a copy of screen shots Holcombe took while communicating with defendant on Skout. Sanchez messaged, "Was good with you Emily. I use to talk to you on here before. Was good with you?" As the chat continued, Al mentioned that Emily had told him she went to College Park, which she confirmed, saying, "Yeah. Cool." Shortly later, she asked him how old he was again, and he said 28, to which she responded, "Oh cool." He responded, "You cool with that?" and she responded with, "Yeah r u cool with me being 14?" Al

5

then said, "I'm cool with that." The conversation on Skout ended with Al suggesting they text, Emily agreeing and Al providing his phone number.

Posing as Emily, Holcombe then texted Al. Holcombe authenticated Exhibit 3, which consists of the text messages between Sanchez and Emily that were downloaded from Sanchez's cellphone, and it was admitted. Sanchez and Emily texted about soccer, and he suggested they "play 1 vs 1." He asked her to send him a picture, and she sent one of herself in shorts and a sweater that did not show her face. He asked why she was "hiding," and she responded, "[c]uz I'm nervous to talk to an older guy." He asked whether she was "into older guys" or he was "just the lucky one." She said, "I've thought about it one of my friends hooked up with a guy like 20." He responded, "I'm also a little nervous since you are younger but you got my attention" and followed that with, "And if I may say I do like the picture you sent me. You have a nice body." He texted a picture of himself in a hoodie, and she wrote, "R u cold" and then "Cute!"

A bit later, she texted, "It's freezing" and he wrote back, "We need to cuddle then." She wrote, "Oh really," and he responded, "We can stay warm together" and then, "You know you thinking that" with a kiss emoji. She texted, "I've never done that" and "Anything." He texted, "Not even kissing?" and she wrote, "Yeah kissing" and "For sure" and asked if he had a "gf." He said, "We can do some cuddling if your down with me" and "No I'm single." She responded, "That's cool," and he replied, "I bet you have a bed since your beautiful" and then "BF." She texted, "I have a bed. LOL" and then, "And no bf." She asked, "What do we do while cuddling" and he texted, "We can be on a bed or couch and just hold each other closely. Some kissing." She responded, "Some kissing huh. Ha." He said, "Don't need to be but hey [emoji] lol." She said she "would want to" and he followed up with saying he

6

was "glad" she did and asking her what she "enjoy[ed] doing with a guy or want[ed] to try." She responded, "I've kissed but you know I'd do more" and he said, "Sounds hot."

They continued texting in the same vein, exchanging more photos with him responding that she is "fucking beautiful" and he "can't believe" he is "attracted to a younger girl." He suggested several times that she "come over" to his apartment. She mentioned having an older sister and he discouraged her from telling anyone she was talking with him. He asked her when they could "hang out," when she was free, and said "we can go kick it anywhere you want." She said she was nervous and he assured her, "We don't have to do anything you don't want to. I just want to be with you." He said he was also "nervous." "Not to be with a girl but because your younger." She said she had to go shower and he said he wanted to see her in the shower.

He suggested that maybe he could meet her at the mall that day if she could get away from her sister. When she told him that might be hard, he urged her to "think about it. Even if we just walk by one another without saying hi. I just want to see you baby." Instead, she suggested they could meet somewhere the next day. She said they could meet at 1 or 2 the next day, she asked him what she should wear, and he responded, "What's the sexiest thing you have?" She said "nothing," and he suggested she wear the shorts she was wearing in the picture and asked which of her panties and bra she thought were the sexiest. She said she didn't really need a bra but would wear one, and that if he liked them big, that wasn't her. He told her not to worry, he would "play with them" anyway. She said she'd never had a guy touch them, and he assured her she'd enjoy it and told her he was "getting hot over here thinking about it." He asked whether she ever touched herself

and whether she liked it.  As they texted about it, he told her he was getting "really hot," and asked her to "guess what you got me doing now."  They discussed meeting the next day at a soccer field she identified by location, she asked if she could text him that night and he responded, "text me tonight my sexy princess."  Later that evening, they texted about soccer and where she played, she told him she was in ninth grade, and they texted about her school and her family.

The next morning, he texted her, "You still down to kick it?" and she responded, saying, "Yeah after like 1."  They agreed he would pick her up at Hidden Lakes.  She told him she didn't want to get pregnant.  He responded that they didn't "have to go that far" but if they did, he had protection.  He asked if she'd wear "some sexy shorts or some sexy leggings," and she said she would for him.  She told him she was "excited," and he asked her what she was most excited about.  She responded, "Just doing stuff I never had I guess."  She asked, "U?"  He replied, "To make you feel great and make you remember this forever."  She expressed concern about not knowing what to do, and he assured her, "I will help you and you just have to let me know if your enjoying it or not."  She asked, "What do I do for u?," to which he answered, "We will see baby."  After texting further about acts they liked, like kissing, "feeling on" each other and "play[ing] with" each other "down there," they agreed to meet at the soccer field in Hidden Lakes Park.

At 1:06 p.m., she texted that she was "on [her] way" and at 1:09 p.m. that she was "[a]lmost there."  At 1:13 p.m., he texted asking what color her "sweats" were, and she responded "[b]lack."  Sanchez's last text was at 1:15 p.m., asking where she was coming from.

In the meanwhile, Holcombe had arrived at the park and spotted Sanchez.  He saw Sanchez travel into the park, leave and exit onto the side

8

streets and return and circle through the park again. Between Sanchez's first and second entries into the park, Holcombe saw a girl walking through the park with black sweats on and became concerned that Sanchez would believe that was Emily. He informed the rest of his team "that we were going to just initiate a traffic stop on him." They stopped Sanchez at an intersection of Morello and Elderwood in Martinez near its border with Pleasant Hill. At the time of the stop, Holcombe confirmed Sanchez's identity and that he was 28 years old, arrested him and confiscated his iPhone.

At the time of the arrest, Holcombe advised Sanchez of his *Miranda* rights. While he was doing so, Sanchez asked, "I'm not going to spend any time in jail for this?" When Holcombe finished explaining his rights, Sanchez said he was nervous and then, "I've never done shit like this before. I can't believe that I . . ." and then, "Cause I also work with kids, and I can't . . . ." Holcombe asked about his work with kids, and Sanchez described his work for Lamorinda Soccer Club. Holcombe then asked, "So what's going on today, man? Who are you here to meet?" Sanchez responded, "I was going to meet a girl. A Person that . . . ." Holcombe interjected, "What's her name?" and Sanchez responded, "It's Emily, but I assume it was you guys." When Holcombe asked him why he assumed that, he said, "Because you guys were arresting me, and I was . . . ."

Later in the conversation, Sanchez made other incriminating statements: "Like I said, I've never done this shit like this before, so. I mean, at the end of the day is my fault, so I should face the consequences." And "So based on this, I assume on my record I'm not going to be able to work with kids anymore." Holcombe asked whether "[Emily said] something about she didn't want to get pregnant and you said you had protection?" Sanchez responded, "Yeah. Technically, I never said I was going to do it, but yeah, I

9

know what you mean. I know whatever I say is going to look bad. It's at the end of the day, if I apologize for it, it doesn't matter what I say, or what I do, it's just the fact that—" Holcombe interjected, asking what he thought he had done wrong, and Sanchez replied, "The fact that she tried to talk to me about sexual stuff and I tr– I got into it, and I shouldn't have. Because I was in the mood with other girls too, and the fact that I was talking to her at the same time. It will seem as it is from other people."

Holcombe searched and retrieved information from Sanchez's cellphone including items searched and web history. According to that web search history, a few days before he was arrested Sanchez had searched for "teen porn." He visited a website called Pornhub.com and pages that were labelled "teen" and viewed several videos with titles involving teens and pornography. After his lengthy text conversation with Emily on January 3, 2019, Sanchez searched a site called "Askmen.com" for information about virgins and sleeping with virgins, choosing condoms, and lubricants. Later that evening, he did some searches about College Park High School, College Park JV soccer, GotSoccer rankings and Walnut Creek Soccer.

### b. Sanchez's Testimony

Sanchez testified that on January 4, 2019, he was employed as the head coach at a soccer club called Lamorinda Soccer Club that serves Lafayette, Moraga and Orinda. He was the head coach of three younger teams of girls and boys, working with children from 7 to 12 years old and up to 18 years old and did camps for preschoolers. One season, he also coached an adult semi-professional team. At the time of his arrest, he worked with a team of under-14 girls that travelled all over the country and worked with a team of under 14 to under 18 at the same time and was the head coach for under 14, under 13, under 11 and under 10, all girls. Coaching opened doors

10

for him and turned his life around. He never had any negative experiences or complaints while coaching that involved sexual matters. There were sometimes issues with parents of kids who play soccer, which in the area where he worked was "very political." Some families want their children to play with their friends and not be challenged and believe the club where he coached is too competitive because of their training schedule. He sometimes talked with the students he coached about school, education, families and problems they couldn't talk to anyone else about. No one ever complained about his interactions with students.

He is a straight male who goes online to date. He isn't "the handsomest guy" and works "a little bit hard to convince ladies 18 and over." He is interested in women of all ages and has talked with an 18 year old in Antioch-Pittsburgh, a 30 year old, and a 45 year old in San Diego. Sometimes if he talks to a woman online, he meets up with them. He was conversing with the 18 year old, Sophia, who he had met online, in January 2019. They had some sexual conversations, he talked about and bought and sent her some sexy lingerie, and after she mentioned she was a virgin, he went on a website called www.Askmen.com to learn about the best way to satisfy a virgin. For the last 10 years, he had a sexual interaction with at least 10 women a year. Sometimes the women he talks with on the dating applications don't like how he looks, which hurts, but he has to move on.

As an adult, he has never dated an underaged person. He stays on 18-and-over websites. He had been using Skout for about seven years when he had the conversation with Emily. He first had a conversation with her on December 1, 2018, during Thanksgiving weekend. Her profile says, "Emily 18 years old." There was a dog in her profile photo so you really couldn't see her face very well. The rules for the Skout dating app do not allow 14 year

11

olds to be on the site. The conversation he had with Emily at that time wasn't too sexual but "trying to flirt a little bit, trying to get to know the person." The person posing as Emily mentioned College Park, and he remembered that was a high school where he had once had a soccer game. He deleted his app at the time because he realized she might be in high school. He made a notification or flag about the issue of her age, and the website responded, "[T]hank you for submitting, we're going to look into it." Then he deleted his account.

Between the time he had reported Emily's profile and the time of his arrest, he had sexual conversations with Sophia and with Jen, a 45-year-old women living in Antioch. He downloaded the Skout app again on December 18 or 19, 2018. A few days later, he received a notification from the "so-called Emily" indicating she had looked at his profile. He remembered it as a "little suspicious" because she was talking about a high school, the College Park High School. Because of something that had happened at work, he wondered whether this was "somebody trying to pretend to be a minor to try to make me do something." When the soccer club where he worked became one of the top 72 clubs in the country, some kids were let go because "[t]hey just weren't ready for that kind of commitment and level." The club started to bring in more players, and some parents got upset and "would do anything to kick that coach out to replace them with another head coach so they can cater to the people, for example, coaches that do personal training and therefore you play them a little bit more." So the head coach of the academy team could not coach his team and Sanchez had to go coach the academy during that period. The soccer politics created problems between clubs because when parents were unable to kick coaches out, they would start a new club and recruit the old team's players. Because of the soccer politics that had been happening,

Sanchez assumed that Emily was "somebody trying to pretend to be a minor to try to frame me for something." Two previous coaches had been accused by some parents of sexual misconduct, but it was proven that nothing happened and so they and their kids left the club.

When he first texted with Emily, his intention was to try to keep the conversation going so he could find out who the person was who was trying to frame him and whether it was someone from a competing club. As soon as the person told him she played for Walnut Creek, which was a rival of his club, he searched GotSoccer.com, which has all the players' names of all the teams, and he did not find the name Emily on any of the Walnut Creek teams. He wanted to confirm whether there in fact existed such a person. He did that to protect himself and others. He engaged in sexual conversation because it was an 18-and-over app and he assumed it would keep the person engaged, and he went with the flow hoping they would give him a specific detail he could use against them.

After he put "Emily's" number into his contacts, his Twitter account gave him the profile name of "Lizzy Simmons" as a contact associated with that phone number. The profile picture showed that "Lizzy" was 13 or 14, wore braces, and wearing a little gown as if she was going to prom and was from Martinez, California. That made him suspicious because he had never known two people who use the same phone to try to contact multiple people. He wondered if there were two younger minors or "somebody else pretending to be a minor for whatever intention they try to do that for." At that point, his intention was "get proof, get evidence to show either, if it is a minor, to report the minor; if it's any adult, to report the adult that's acting to be a minor." He was willing to do that because he loved coaching and it was "suspicious" after "all the soccer stuff came out." He never sent explicit

13

photographs to Emily because he didn't trust the profile. He had sent them to the other women he had conversed with.

When he sought to video chat with Emily on FaceTime to confirm her identity and she gave an excuse, he searched to see if he could confirm the excuse she gave because he didn't believe it was true. His search confirmed his belief that her excuses were illegitimate and further raised his suspicions. It was then that he set up to arrange a meeting with Emily. His intention was to see if anyone specific to what the message was saying would show up, allowing him to take a video or a picture to use as evidence he could report to Walnut Creek or the police.

When he went to the park, he did not intend to get out of the car at all, but instead to drive around "just to see who was there." There were a few people there. He intended to take a picture of the person if there was someone wearing what the so-called Emily said she was wearing or she looked like the picture. He saw somebody wearing leggings and decided, "okay, it might be a young one, I'm just leaving at that point." He drove around twice and then left the park; he did not go into the parking lot. He did not bring any condoms, lubricant or lingerie with him; nor did he bring a soccer ball. He had no intention of engaging with an underage girl in the park. He didn't take a picture of the person wearing the black leggings because she was too far away and he didn't know how to zoom very well on his camera, so he just decided to leave. He drove about a quarter mile down the street to the stop sign, saw the sirens and was arrested. He said some things to police because he was nervous since it was the first time he had been arrested and there were "six cops with guns on me" for part of the time.

### c. Omar Bautista's Testimony

Bautista testified he had known Sanchez since he was born, and they

were close friends.  He, Sanchez and another friend had agreed to go hang out on January 4, 2019.  They typically had lunch and then did some shopping and were supposed to meet up some time near midday.  He texted both that morning to confirm they were still getting together, heard back from the other friend but didn't receive a text back from Sanchez.  He kept texting even after they finished eating lunch and when they were shopping but did not hear back.

### d.  Holcombe on Rebuttal

Holcombe testified that after Sanchez testified, he searched Sanchez's cell phone again and reviewed all of Sanchez's Twitter activity on January 3 and 4, 2019.  Contrary to Sanchez's testimony, he found nothing pertaining to anyone named "Lizzy."  He found no photograph associated with a profile of someone named "Lizzy" in January 2019 and found no search for a "Lizzy Simmons" profile.  Nor was there any evidence that Sanchez's phone had synced with his Twitter account on January 3, 2019.  Holcombe testified that there was a photo like the one Sanchez had described of a girl with braces wearing a gown, but not on Sanchez's phone.  That photo was one Sanchez could not have viewed on Twitter in January 2019.  The photo he was using for Lizzy Simmons at that time was different.  The photo Sanchez described was one Holcombe received from a detective later, in February 2020.

### 3.  Jury Deliberations and Verdict

After deliberating for about three hours spread over parts of two days, the jury returned verdicts of guilty on all three counts.  The jury's only request during deliberations was to review Sanchez's "testimony about seeing the girl in the black leggings in the park and why he left."

## C.    The New Trial Motion

Before sentencing, Sanchez filed a *Marsden* motion and asked the court to refer him to the public defender's office.  The court granted the motion and appointed the public defender's office to represent him.  After receiving continuances, the public defender's office filed a motion for new trial in July 2021 asserting multiple claims of ineffective assistance by his trial counsel.  The matter was heard September 2021, nearly a year after the trial.  The transcript of the hearing reflects that the court gave counsel ample opportunity to present their arguments, was very familiar with the record and carefully considered the motion, taking it under submission.  On October 15, 2021, the court issued an order denying the motion.

## D.  Sentencing

After denying the motion for new trial, the court suspended sentence and imposed a term of two years felony probation and ordered Sanchez to register as a sex offender.

## DISCUSSION

### A. Sanchez Was Not Convicted of a Charge Not Made.

### 1.  The Charge and Jury Instructions on Count One

The information charged Sanchez in Count 1 with a violation of section 288.3, subdivision (a).  That section provides, "Every person who contacts or communicates with a minor, or attempts to contact or communicate with a minor, who knows or reasonably should know that the person is a minor, with intent to commit an offense specified in Section 207, 209, 261, 264.1, 273a, 286, 287, 288, 288.2, 289, 311.1, 311.2, 311.4 or 311.11, or former Section 288a, involving the minor shall be punished by imprisonment in the state prison for the term prescribed for an attempt to commit the intended offense."

16

The information alleged that, "On or about January 4, 2019, in the County of Contra Costa, State of California, the crime of Contact With Minor For Sexual Offense in violation of [section] 288.3[, subdivision] (a), a Felony, was committed in that Alejandro Sanchez did unlawfully contact and communicate with a minor, knowing that the person was a minor, with the intent to commit an offense specified in Penal Code Section 207, 209, 261, 264.1, 273a, 286, 288, 288a, 288.2, 289, 311.1, 311.2, 311.4, and 311.11 involving the minor."

The court instructed the jury on this charge, Count 1, using CALCRIM No. 1124:

"The defendant is charged in Count 1 with contacting a minor with the intent to commit Lewd Act Upon a Minor in violation of Penal Code section 288.3[, subdivision] (a).

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant contacted or communicated with a minor;[2]

"2. When the defendant did so, he intended to commit

Lewd Act Upon a Minor involving that minor;

AND

"3. The defendant knew or reasonably should have known that the

person was a minor.

"A *minor* is a person under the age of 18."

"*Contact or communication*" with a minor includes direct and indirect contact or communication.

---

[2] The court did not instruct the jury on the second alternative the statute articulates as establishing this element—the defendant "*attempt*[*ed*] *to contact or communicate with a minor . . . .*" (Italics added.)

17

"To decide whether the defendant intended to commit a lewd act upon a minor, violation of Penal Code Section 288, please refer to the separate instruction regarding that offense." The court then instructed on Lewd Act with a Minor using CALCRIM No. 1112.[3]

After the jury was instructed and outside its presence, the district attorney questioned whether the instruction for Count 1 should be modified, wondering whether there was "a pinpoint where it doesn't actually have to be a minor for Count 1" because the instruction "makes it sound like it has to actually be a minor." The court agreed, suggesting the district attorney "check in your office and see if you come up with something. I know that's going to be the first question from the jury." The district attorney responded,

---

[3] The instruction on Count 2, meeting a minor for a lewd purpose, stated in relevant part that to prove defendant was guilty of that crime, the People had to prove that (1) "[t]he defendant arranged a meeting with a person he believed to be a minor"; (2) "[w]hen the defendant did so, he was motivated by an unnatural or abnormal sexual interest in children"; (3) "[a]t that meeting, the defendant intended to engage in lewd or lascivious behavior"; and (4) "[t]he defendant went to the arranged meeting place at or about the arranged time."

The instruction on Count 3, attempted lewd act upon a child, provided that to prove the defendant was guilty of that crime, the People had to prove: (1) "[t]he defendant took a direct but ineffective step toward committing Lewd Act Upon a Child"; and (2) "[t]he defendant intended to commit Lewd Act Upon a Child." That instruction defined a "direct step" as one that "requires more than merely planning or preparing to commit Lewd Act Upon a Child or obtaining or arranging for something needed to commit Lewd Act Upon a Child. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to commit Lewd Act Upon a Child. It is a direct movement towards the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt."

18

"What I've seen in the past is the reasonable [*sic*] should have known—it says the defendant contacted or communicated with somebody he reasonably believed was a minor."  The judge said she would take a look, the district attorney should "go back and take a look," "[defense counsel], you should also take a look if there's some language that you think is appropriate" and "I do think it should be clarified before they start deliberating or that's going to be an issue."

Defense counsel responded, "Meaning that it doesn't—that they will get confused that it doesn't count because it's Holcombe not a minor." The court agreed.  "The evidence is that the pictures are of someone who was a minor at the time, but it's actually an adult now.  That's not the issue.  You don't have to show that the person was indeed right now a minor.  It's whether or not the defendant believed the person to be a minor.  But the instructions don't read that way."  The district attorney responded, "Right.  That's the same language, for example, in Count 2 CALCRIM it says the defendant arranged a meeting with that person he believed to be a minor.  So I'm pretty sure it's the same language with Count 1, but I will double check." And finally, the court said, "I will do the same.  I will look at the CALCRIM, but you might also have a pinpoint that you used in your office before."  At that point, there was a discussion off the record, and following that they broke for lunch.

It is unclear whether during the off-the-record discussion, the court and counsel continued to discuss the matter or decided how best to handle it. What the record does show is that when the jury returned, no clarifying instruction was given, and the district attorney gave her closing argument and specifically addressed the issue in her argument.

19

After discussing the evidence, she turned to the charges. "Now let's talk about the actual charges. Contacting a minor with intent to commit lewd act upon a minor. Defendant contacted or communicated with the minor. Here we have both. He reaches out to her. They're communicating for several days. When he did this, he intended to commit a lewd act. We just talked about what those are. He knew or reasonably should have known the person was a minor. *It doesn't matter that the defendant was not communicating with a real minor, okay? The jury instruction can be a little confusing. It doesn't matter. Just what he believed.*" (Italics added.)

Turning to Count 2—meeting a minor for lewd purposes in violation of section 288.4, subdivision (b)—the deputy district attorney noted that some of the elements of that crime "are going to be repetitive." She continued, "Defendant arranged a meeting with a person he believed to be a minor. . . . He arranged the meeting and he thought she was a minor." She told the jury, "Element one [of Count 2], same as Count 1.

Defense counsel neither objected to these statements nor disputed this statement of the law in his own closing argument. The jury expressed no confusion.[4] As we have indicated, it deliberated for only three hours before reaching a verdict of guilty on all counts. The record does not reflect that it requested any clarifications about Count 1, section 288.3 or any other legal issue.

---

[4] The court had instructed the jury to "[p]ay careful attention to all of these instructions and consider them together." And, "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." We presume the jury followed these instructions and did not view the deputy district attorney's clarification as conflicting with the court's instructions on Count 1.

## 2. Sanchez's Due Process Argument Lacks Merit.

Although Sanchez's argument is not entirely clear, his central contention is that he was "convicted on a charge not made." He contends that he was charged only with contacting an actual minor with intent to commit lewd acts and the jury convicted him under instructions on that charge only but that the People ask us to affirm on the basis that he committed the different offense of attempting to contact a minor. He maintains this violated his right to due process.

Count 1 charged Sanchez with violating section 288.3, subdivision (a). As indicated above, this statute applies to "[e]very person who contacts or communicates with a minor, *or attempts to contact or communicate with a minor*, who knows or reasonably should know that the person is a minor, with intent to commit" a specified offense. (Italics added.) Sanchez acknowledges that the courts have interpreted section 288.3 to "incorporate[] attempt into the crime itself." (See *People v. Korwin* (2019) 36 Cal.App.5th 682, 688 (*Korwin*); *People v. Moses* (2020) 10 Cal.5th 893, 903-904 & fn. 7 (*Moses*) [citing *Korwin* with approval and noting punishment is identical under the statute for the completed offense and the attempted offense].) However, he contends the information and the jury instructions charged him only with the completed offense, which required that there be an actual minor. This violated his right to due process, he claims, because he "had a federal due process right 'to be heard on the specific charges of which [he or she] is accused.' "

First, we disagree with the legal premise of this argument—that attempt to contact a minor for lewd purposes and contact with an actual minor for lewd purposes are distinct offenses. As the court stated in *Korwin*, "Section 288.3, subdivision (a) makes an attempt to communicate with a minor a completed crime" and "incorporates attempt into the crime itself."

21

(*Korwin, supra,* 36 Cal.App.5th at p. 688.) The statute "does not actually require a minor victim." (*Ibid.*) An attempt to contact a minor and actual contact with a minor are proscribed by the same subdivision of the same section and are subject to the same punishment. Unlike many, if not most, crimes of attempt, section 288.3, subdivision (a) does not set forth only one completed offense and require attempt to be charged under section 664 as a separate offense with distinct elements and punishment. (See *Korwin,* at p. 688 [distinguishing *People v. Rojas* (1961) 55 Cal.2d 252]; *Korwin,* at p. 689 [discussing § 664].)

Second, although the issue was not framed in the language of "attempt" at trial, the jury understood it was convicting Sanchez of communicating with a person he believed to be a minor, not an actual minor. The evidence at trial made clear that there was no actual minor. There was no evidence, argument or implication that any child was part of the messaging and texting Sanchez engaged in. There is no doubt the jury understood the instructions on count 1, either alone or with the benefit of the district attorney's explanation, to reach conduct with someone the defendant believed was a minor even if the person was not actually a minor. The district attorney described the instructions as equivalent to those for the violation of section 288.4 charged in count 2 (meeting a minor for lewd purposes) in that proof of an actual minor was not required. The defense did not object to or dispute that assertion, and the jury, instructed to disregard arguments of counsel that were inconsistent with the court's instruction, apparently did not find it to be so. On this record, it is inconceivable that the jury convicted Sanchez under section 288.3, subdivision (a) based on a belief that he had contact with an actual minor. Rather, in the absence of even an iota of evidence or argument supporting such a theory, it is obvious that the jury

22

convicted him of contacting or communicating with someone he *believed* to be a minor—which amounts to an attempt to contact a minor and, as explained in *Korwin,* is the same offense as contacting a minor under section 288.3, subdivision (a).  Thus, the crime Sanchez was convicted of committing is the same crime with which he was charged.[5]

Complaining that the information and jury instructions could have charged him with communicating with and attempting to communicate with a minor but charged only the former, Sanchez contends that if he had been charged with attempt, he could not have raised the defense of impossibility. The significance of this point is unclear since the case was litigated and tried with nary a suggestion of an actual minor victim and the defense never invoked the defense of impossibility.  He does not argue instructional error in his opening brief though he implies that is the issue in his reply brief, and the reply disclaims any complaint that he lacked notice of what he was charged with.[6]

---

[5] To the extent Sanchez's argument is that he should have been charged under the attempt statute, section 664, he is incorrect. *Korwin* rejected that argument because section 288.3 "incorporates attempt into the crime itself" and section 664 "allows for an attempt charge only when no other provision is made by law for such an attempt." (*Korwin, supra,* 36 Cal.App.5th at pp. 688-689.)

[6] Any claim of lack of notice would be frivolous.  From the moment he was arrested, Sanchez began to realize the accusation may have been based on communication with a law enforcement decoy posing as minor.  Any uncertainty was eliminated at the preliminary hearing, at which Holcombe testified solely to communications between Sanchez and Holcombe himself, *posing* as a 14 year old named "Emily."  No witnesses other than Holcombe testified at the preliminary hearing, and the People presented no evidence suggesting Sanchez communicated with an actual child.  The evidence at trial was the same, and from the People's opening argument to the closing argument rebuttal, there was no suggestion that Sanchez communicated with

If Sanchez means to challenge the jury instruction, as used in this case, as erroneous because it did not instruct that an attempt to communicate with a child who is actually an adult violates section 288.3, subdivision (a), he has forfeited the claim. His counsel neither objected to the instruction nor proposed any clarifying language, even after the People raised the potential for confusion and the court invited proposed clarifying language from both counsel. (See *People v. Lee* (2011) 51 Cal.4th 620, 638 ["failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal"].) "A party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503; accord, *People v. Hardy* (1992) 2 Cal.4th 86, 153 ["[B]ecause the instruction given was correct, it was incumbent on defendants to request clarifying language. Their failure to do so waived the issue"].)

Moreover, we would reject this instructional error argument on the merits. The court's omission of the statutory language "or attempts to contact or communicate with a minor" was not prejudicial. Theoretically, the jury *could* have applied the instruction literally and ignored or rejected the People's unchallenged clarification. The omission potentially could have *benefited* Sanchez by resulting in an acquittal or a hung jury. Sanchez does not suggest any scenario in which the omission could have prejudiced him, and the omission did not prevent him from presenting evidence concerning a contested element of the crime. Indeed, the defense on which he focused, that

___

an actual minor. The defenses at trial were that the People overreached and that Sanchez suspected or believed he was communicating with an adult.

he did not believe he was communicating with a minor when he texted "Emily," would have been the same if the instruction had included the "attempt" language.  And the jury necessarily rejected that defense.  In similar circumstances where an erroneous instruction potentially benefited the defendant by making it easier to convict him of a lesser included offense or by including an element not required by the statute, our courts have held the error harmless.  (*People v. Fields* (1983) 35 Cal.3d 329, 364-365; *People v. Aznavoleh* (2012) 210 Cal.App.4th 1181, 1183; *People v. Belton* (2008) 168 Cal.App.4th 432, 439; *People v. Salcedo* (1994) 30 Cal.App.4th 209, 217.)  Here, the claimed error is harmless under either the *Chapman* or the *Watson* standard.  Finally, insofar as Sanchez contends prejudice is not required, in other words, that the omission amounted to structural error, he is incorrect.  (See *People v. Flood* (1998) 18 Cal.4th 470, 501.)

### B.  Sanchez Has Not Shown Denial of His New Trial Motion Was Prejudicial or an Abuse of Discretion.

Sanchez contends the trial court erred in denying his motion for new trial because he established that his trial counsel provided ineffective assistance of counsel in violation of the Sixth Amendment.  Specifically, he contends trial counsel (1) failed to investigate to find witnesses who could testify that his claimed belief that he was being set up by parents of some of the girls he coached was plausible and that he never exhibited any sexual interest in young girls; (2) failed to retain a *Stoll*[7] expert to show he did not fit the profile of a child molester; (3) disclosed privileged attorney-client communications and defense strategy to the prosecutor; (4) failed to object to Holcombe's testimony that he had received tips that minors were sexually exploited on Skout and that he had cases involving child pornography on

---

[7] *People v. Stoll* (1989) 49 Cal.3d 1136 (*Stoll*).

25

Pornhub.com; (4) failed to prepare Sanchez and witness Omar Bautista to testify; and (5) showed contempt for appellant throughout his representation. In support of the motion, he submitted his own declaration and declarations of his former counsel, Nabiel Ahmed, an assistant public defender, and an investigator for the Contra Costa County Public Defender's Office attaching memoranda documenting her investigatory interviews. He asserted that these deficiencies in trial counsel's performance prejudiced him both individually and cumulatively.

### 1. Legal Principles

Although ineffective assistance of counsel is not one of the statutorily enumerated grounds for moving for a new trial (see § 1811), our high court has held that such a claim may be raised in a motion for new trial. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582 (*Fosselman*).) "It is undeniable that trial judges are particularly well suited to observe courtroom performance and to rule on the adequacy of counsel in criminal cases tried before them." (*Ibid.*) A trial court should decide such a claim in the context of a new trial motion "when the ' "issue of counsel's effectiveness can be resolved promptly at the trial level" ' and justice will thereby be expedited." (*People v. Carrasco* (2014) 59 Cal.4th 924, 981.)

" ' " 'A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.' " [Citations.] "First, the defendant must show that counsel's performance was deficient." [Citations.] Specifically, he must establish that "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] In evaluating defendant's showing we accord great deference to the tactical decisions of trial counsel in order to avoid "second-guessing counsel's tactics

and chilling vigorous advocacy by tempting counsel 'to defend himself against a claim of ineffective assistance after trial rather than to defend his client against criminal charges at trial . . . .' " ' " (*People v. Klvana* (1992) 11 Cal.App.4th 1679, 1711.)

While deference is " ' "not an abdication" ' " (*People v. Klvana, supra,* 11 Cal.App.4th at p. 1711), "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.] There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." (*Strickland v. Washington* (1984) 466 U.S. 668, 689.)

"In addition to showing that counsel's performance was deficient, a criminal defendant must also establish prejudice before he can obtain relief on an ineffective-assistance claim." (*People v. Ledesma* (1987) 43 Cal.3d 171, 217.) "Generally, . . . prejudice must be affirmatively proved. [Citations.] 'It is not enough for the defendant to show that the errors had some conceivable

effect on the outcome of the proceeding. . . . The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]  Specifically, 'When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.' " (*Id*. at pp. 217-218.)  " 'This second part of the *Strickland* [*v. Washington*, *supra*, 466 U.S. at p. 689] test "is not solely one of outcome determination.  Instead, the question is 'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.' " ' " (*In re Valdez* (2010) 49 Cal.4th 715, 729.)  Unless a defendant shows both serious deficiencies in counsel's performance and prejudice, " 'it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.' " (*Ibid*.)

"[W]e generally review the [trial] court's ruling on a motion for a new trial under a deferential abuse of discretion standard, but we independently review for legal error." (*People v. Ramirez Ruiz* (2020) 56 Cal.App.5th 809, 831; accord, *People v. Hampton* (2023) 96 Cal.App.5th 965, 977; see also *People v. Hoyt* (2020) 8 Cal.5th 892, 957 [applying abuse of discretion standard to denial of new trial motion based on ineffective assistance].)

### 2. Analysis

We must assess defense counsel's conduct and its impact on the trial recognizing the serious challenges he faced in representing Sanchez from the outset.  (See, e.g., *People v. Holt* (1997) 15 Cal.4th 619, 705 [counsel's performance and tactical decisions must be viewed with recognition that he

28

represented defendant who made pretrial admission of many or most elements of charged offenses and focus[ed] [his] efforts on a penalty phase defense rather than risk losing credibility in an attempt to persuade the jury the defendant is not guilty"].)  Here, the prosecution had damning evidence, including Sanchez's messaging on Skout and texts that included detailed sexually explicit communications with a purported 14-year-old girl and plans to meet at a specific place and time to engage in sexual activity.  While the precise scope of the activity was left open, there was discussion of Emily's "sexiest" "panties and bra," of cuddling, kissing, him touching her breasts and touching her "down there," of his desire to see her in the shower and getting "hot" thinking about it, of her wanting to do things she had never done before and of him wanting "[t]o make [her] feel great and make [her] remember this forever."  The prosecution also had Holcombe, who could authenticate all the messages and testify to Sanchez's arrival at the agreed upon meeting place, and a recording of Holcombe's interview of Sanchez that culminated in Sanchez making seriously incriminating statements admitting his guilt.  When Holcombe asked what he thought he had done wrong, Sanchez said, "The fact that she tried to talk to me about sexual stuff and I tr– I got into it, and I shouldn't have."  Given this evidence, defense counsel's task was daunting.

Another circumstance we consider is the fact that the parties engaged in "extensive pretrial negotiations" endeavoring to reach a plea agreement and were unable to achieve one because the district attorney insisted on, and Sanchez was unwilling to agree to, his registration as a sex offender for some period of time.

Turning to the claims of ineffective assistance that were the basis for Sanchez's new trial motion, he first argues his trial attorney, Ahmed, failed

"to search out witnesses to support [his] defense—that he had a reasonable basis to believe he was being set up." He contends Ahmed didn't investigate because Sanchez was unable to provide further payment beyond the $15,000 he had paid for representation through the preliminary hearing. Sanchez's declaration states that he asked Ahmed to contact his "old boss Mohamed Mohamed" who could "explain the situation in more detail than I could," but that Ahmed refused to contact any witness without additional payment.

Ahmed's declaration tells a very different story. He stated that when Sanchez relayed that "he believed his arrest was the result of a 'setup' potentially created by angry parents of players at the Lamorinda Soccer Club, where he was a coach," and that "he believed another coach at the club had been accused of inappropriate contact with the children," Ahmed "contemporaneously asked Mr. Sanchez for witness information regarding this belief," telling him his statement was "important." Sanchez did not provide him the information "at that time," and Ahmed told him "to contact me by any method to provide me with further information regarding this belief," but Sanchez "failed to do so." According to Ahmed, he persisted in seeking that information, but Sanchez was "unable" to provide it. Ahmed further stated that, at some point after, Sanchez had still failed to provide more fees leading Ahmed to file a motion to withdraw, Ahmed ultimately withdrew the motion and was "aware that I may need to file a motion for ancillary services to effectively represent my client." However, Sanchez failed to provide the information regarding his witnesses and defenses and "remained largely uncommunicative" and Ahmed did not file an ancillary services motion. By the time Sanchez gave him the name of Mohamed Mohamed without any contact information, Ahmed "couldn't pursue this

30

information further as trial had already began [*sic*], and it didn't appear the defendant was sure of the information he was providing me."

In its order, the trial court found that "[m]any of the allegations of deficiencies made by Defendant as evidence of ineffective assistance of counsel fall squarely within the realm of reasonable tactical decisions. In trial counsel's declaration, attached as Exhibit A to Defendant's motion, he articulates his reasons for his decisions and sets forth reasonable explanations for his decisions made both in preparation of and during the trial." The court did not specifically address every allegation in detail, but we infer that it credited trial counsel's explanations, including that he did not investigate because Sanchez failed to provide him the information he requested. We defer to the trial court's credibility determinations. (*In re Alcox* (2006) 137 Cal.App.4th 657, 665.)[8]

Further, the trial court expressly found that if any of counsel's decisions fell "outside the bounds of reasonable," "even when taken together, [they did not] lead to a 'reasonable probability' that the outcome of the trial would have been different." Regarding Sanchez's "assertion that evidence gathered by the Public Defender's Office was 'powerful corroboration' of Defendant's defense that another coach was 'set up' and falsely accused by parents," the trial court disagreed, stating, this "is not borne out by the exhibits submitted in support of the motion." In particular, "Mr. Mohamed's statement (Exhibit M) offers no corroboration that Mr. Mohamed was 'set up'

---

[8] The new trial motion was based on a paper record, but the trial judge had ample opportunity during the trial to observe defense counsel's and Sanchez's demeanor. As our high court stated in *Fosselman*, "It is undeniable that trial judges are particularly well suited to observe courtroom performance and to rule on the adequacy of counsel in criminal cases tried before them." (*Fosselman*, *supra*, 33 Cal. 3d at p. 582.)

by parents or that Defendant had any specific knowledge of that event. Instead, Mr. Mohamed relayed that another coach (who was later fired by the club) instigated some allegations of 'verbal abuse' several years ago against Mr. Mohamed and that Mr. Mohamed was never removed from his position as the claims were unsubstantiated. These vague statements to the Public Defender's Office investigator do not amount to 'powerful corroboration' that Defendant believed he was being 'set up' by parents and therefore was exchanging messages of a sexual nature with 'Emily' to investigate and identify the culprits."

We have reviewed the declarations and exhibits offered in support of the new trial motion, including the memoranda prepared by the investigator in the Contra Costa County Public Defender's Office of her interview with Mr. Mohamed. We agree that the evidence falls short of proving the investigation would have yielded significant corroboration of Sanchez's testimony at trial about having been suspicious from the outset and believing "Emily" was somebody "trying to pretend to be a minor to try to frame me for something." It did not corroborate his claim that unhappy parents had previously made accusations against two coaches "of a sexual nature," that Sanchez's "intention was to try to keep the conversation [with "Emily"] going to see if they can give me something specific so I can find out who that person was," or that he discussed things of a sexual nature with "Emily" to keep the person "engaged" and "continue with the flow" hoping the person would "give [him] a specific detail that [he could] use against them."

At best, Mohamed and other witnesses only weakly corroborated Sanchez's assertions. According to Mohamed, the accusations were instigated not by upset parents but by another coach who wanted to oust him and move up in the club hierarchy, though that coach was "supported by one

32

or two [club] parents."[9]  Nor did Mohamed or any other witness corroborate that a coach was accused of sexual misconduct.  Rather, according to all the witnesses the public defender's office interviewed, Mohamed was accused of "verbal abuse and being too hard on his players."  Mohamed was the director of the club and said there were allegations against the second highest ranking coach in the club.  He was not certain what those allegations entailed, but believed they involved some sort of " 'inappropriate joking.' "  The allegations against both were resolved in their favor.

But even if the failure to interview Mohamed and the other witnesses had risen to the level of ineffective assistance, there is no reasonable possibility Mohamed's or the other interviewed coaches' testimony would have resulted in a different outcome.  Sanchez's own statements seriously undermined his own credibility, in particular his testimony that he had believed all along that he was being framed by an adult.  His texts with "Emily" included explicit and detailed sexual content as we have described—content that is difficult to reconcile with the idea that he was just trying to keep the conversation going to find out who was trying to frame him.[10]  Worse, when arrested, he admitted to Holcombe that he'd "never done shit like this before," he "was going to meet a girl," "at the end of the day it is my fault, so I should face the consequences," and, in response to Holcombe's question about what he did wrong,"[t]he fact that she tried to talk to me about sexual stuff and I tr– I got into it, and I shouldn't have."  He referred to

---

[9]  One of the other coaches interviewed by the Public Defender's Office investigator (Ahmadi) stated he believed the effort to remove Mr. Mohamed was parent-driven but wasn't certain.  However, he said this was "the general perception" at the club.

[10]  Among his detailed sexual messages to "Emily" were comments that he was "getting hot over here thinking about [touching her breasts]" and intimating masturbation ("guess what you got me doing now").

"Emily" as "she" and "her" throughout the interview. He stated, "I didn't even want to sleep, cause I almost felt sorry for her . . . ." And he omitted at any point during the interview to mention that when he was texting "Emily," he believed he was really communicating with an adult trying to "set [him] up."[11] In short, Sanchez's texts and his statements to Holcombe upon arrest were virtually impossible to reconcile with the idea that he did not believe he was texting with a minor.

Turning to Sanchez's second IAC claim, the trial court disagreed that Ahmed's failure to present a *Stoll* expert amounted to ineffective assistance, crediting Ahmed's explanation of why he chose not to do so and finding his reasons "squarely within the realm of reasonable tactical decisions." We agree with the trial court's reasoning.

"In *Stoll*[, *supra*]*,* a child molestation case, the California Supreme Court held that the trial court erroneously excluded a psychiatrist's opinion that defendant had a ' "normal personality function," ' that defendant had not previously engaged in 'sexual deviancy of any kind' and that it was ' "unlikely . . . she would be involved in the events she's been charged with." ' (*Stoll*, *supra*, 49 Cal.3d at p. 1149, italics omitted.)" (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 567; see also *People v. Ruiz* (1990) 222 Cal.App.3d 1241, 1244-1245.) Ahmed stated he considered retaining such an expert "but did not because he believed that the defendant factually exhibited as unsophisticated in his romantic efforts, and possibly susceptible to the conduct alleged based upon [his] use of the Skout dating application, as well as his Google searches and his communications with Emily." Ahmed

_____

[11] After Holcombe asked him the name of the girl he was going to see, Sanchez said, " 'It's Emily, but *I assume it was you guys*.' " (Italics added.) Holcombe asked why he assumed that, and Sanchez replied, " '*Because you guys are arresting me*, and I was . . . .' " (Italics added.)

explained the factual basis for his assessment in his declaration. In addition, he stated he was "afraid of creating a battle of experts that would highlight the defendant's likelihood of targeting underage females for his romantic interests." Ahmed also explained that he did not present character witnesses to rebut the claim that Sanchez had an abnormal or unnatural sexual interest in children because Sanchez "did not have [character] witnesses available to testify about his successful, demonstrable dating history with adult women."

Sanchez asserts the public defender investigator found witnesses who could have testified "that appellant's behavior as a coach showed no signs of sexual impropriety." But the fact that Sanchez apparently did not engage in any sexual impropriety with the minor girls he coached for the soccer club does not demonstrate his counsel was wrong to be concerned that, in light of the absence of evidence that Sanchez had successful relationships with adult women (as opposed to online interactions on dating websites), testing by an expert would not rule out any sexual interest in young girls.

Sanchez argues that "there is no apparent basis for Attorney Ahmed's unsupported conclusion that persons who are sexually frustrated in their pursuit of adult partners turn to adolescents for gratification," and further, that "*Stoll* itself clearly shows that the expert's testimony in that case was based on his administration of standardized tests and an evaluative interview, not how well the subject scored in her dating life." The assertion is conclusory, as is the similar assertion in the declaration of the assistant public defender submitted in support of his motion for new trial. Sanchez has proffered no explanation or evidence demonstrating what factors a *Stoll* expert does or does not consider in evaluating whether a defendant has a prurient interest in children, and in reviewing case law we have not found

such an explanation. Without more, we cannot assess whether counsel's performance in this respect was deficient.

But even if counsel's assessment fell below professional norms, we conclude it was not prejudicial. The issue for Sanchez, unlike many other accused molestation defendants, was not whether the sexual conduct happened at all. Rather, here, there was no dispute that Sanchez engaged in sexually explicit text messages with "Emily." The issue was whether, as he testified, he suspected he was really texting with an adult rather than an actual 14-year-old girl. The People's evidence, and words from Sanchez's own texts and statements, powerfully rebutted that testimony. He told "Emily" he was "getting hot" while they talked about him touching her breasts and that he was "really hot" after she told him (in response to his question) that she had touched herself before. Twice, he intimated he was masturbating. He admitted to Holcombe that he "got into it" when she "tried to talk to me about sexual stuff" and "shouldn't have." There was evidence that he had recently searched adult websites for "teen pornography" involving 18 or 19 year olds posing as younger girls. All of this powerfully undercut his claim that he didn't believe he was talking with a minor and related defense that he had no sexual interest in minors. Nor was this a close case since, as we have indicated, the jury deliberated for only three hours before finding him guilty on all three counts. Even assuming counsel was mistaken in believing that Sanchez's lack of successful relationships with adult women would have impeded a *Stoll* expert from opining that he lacked sexual interest in children, the above-described evidence would have been highly likely to do so. (Cf. *People v. Fernandez, supra*, 216 Cal.App.4th at pp. 567-568 [defense that girls defendant was accused of molesting colluded to frame defendant was weak, and counsel's decision not to present *Stoll* expert was harmless].)

In short, we defer to the trial court's credibility determination with respect to Ahmed's explanations. (*In re Alcox, supra,* 137 Cal.App.4th at p. 665.) Exercising our independent judgment, we agree Sanchez has not shown Ahmed's decision not to present a *Stoll* expert was outside the "realm of reasonable tactical decisions" or that it was prejudicial.

Sanchez claims that the "teen porn" evidence would not have been obtained by the prosecution if it had not been for another instance of claimed ineffective assistance on his counsel's part. Specifically, he contends his counsel disclosed to the prosecutor two days before trial began that his defense would be that he "played along with 'Emily' to unearth a set up." The next day, the assistant district attorney informed Ahmed that " 'after our discussion of your client's possible defense and alibi witness Inspector Holcombe wrote and executed [a] search warrant on your client's phone, the one they took from him when he was arrested.' " The search revealed that in late December 2019, Sanchez had visited an adult pornography site called "Pornhub.com" after searching for "teen porn" and viewed videos with graphic titles referring to "teens." In addition to precipitating the prosecution's discovery of this evidence, Sanchez faults Ahmed for not moving to exclude the evidence.

According to Ahmed, on September 11, 2020, he turned over to the deputy district attorney videos Sanchez had sent him two days earlier showing him scrolling through soccer club rosters, along with Sanchez's written explanation that he had searched on Google for a girl named "Emily Johansen" after scrolling through the roster of girl soccer players at a soccer club and finding no one with that name. The videos were turned over because the defense intended to use them at trial. When the deputy district attorney requested an offer of proof, Ahmed replied, " 'Long story short, the

37

defendant is going to say he knew it was a set up and was just sniffing it out.' "

The record indicates that Ahmed had been engaged in plea negotiations up until this point and that the email exchange Sanchez complains about "was for purposes of attempting to resolve this case because the People had a sticking point of the defendant being a sex offender for some period of time." However, Sanchez was unwilling to accept any plea agreement that included even a limited time registration. As the trial court observed at the hearing on the new trial motion, "And around the plea negotiations, you know, some attorneys come at the practice thinking full disclosure, let's put it all on the table and have an honest discussion to see if we can't really, you know, look, these are the things that you have to face, prosecutor, if we go it [*sic*] trial to try to get the best offer. So I think this falls in the tactical bucket."

Further, when Holcombe issued the search warrant, Ahmed did not seek to quash it or to exclude the evidence because "the cellphone download contained exculpatory evidence that I wanted to produce at trial, specifically the defendant's allegations that he searched for various types of pornography apart from teen pornography" and that Sanchez had said they would "find evidence of his conversations with adult women on his phone at the same time he was contacting Emily, and thus demonstrate that [he] had an interest in women, and not just children." Also, "we wanted to search for evidence of [Sanchez's] alleged unrecorded statements with detective Holcombe to further bolster [his] defenses." Ahmed "did not move to exclude evidence of 'teen' pornography (which is actually adult pornography) located on Mr. Sanchez's phone because I believed it was prosecution overreach, which I thought the jury would frown on."

The record reflects that Ahmed submitted evidence of Sanchez's online involvement with other women to the deputy district attorney, and Sanchez testified about those women at trial, corroborating Ahmed's explanation, at least in part.

The trial court, which had ruled in limine that the evidence Ahmed sought to bring in was relevant, concluded Ahmed's decisions, including the decision not to seek suppression of the electronic data, were reasonable tactical decisions taking into account "the People's evidence, the defense to the charges (including the People's alleged 'overreach'), and . . . corroboration of Defendant's assertion that he believed 'Emily' was a fictitious individual and an effort to set him up." And even assuming his decisions were not reasonable, the court concluded that, "even when taken together," they did not "lead to 'a reasonable probability' that the outcome of the trial would have been different" because at trial, "[t]he People's case was overwhelming."

We agree with the trial court on both prongs of an ineffective assistance claim. As to whether counsel's actions were deficient, as we have indicated, defense counsel faced a very difficult case. Further, according to Ahmed, and again deferring to the trial court's acceptance of his explanations, these actions took place on the eve of trial and after trial had begun, when Ahmed was still attempting to negotiate a resolution with the People. It was around this same time that Sanchez provided Ahmed the videos of himself scrolling through soccer club rosters and first gave him the name (but no contact information) for Mohamed. And it was only after Ahmed turned those videos over to the People that they informed him they were searching Sanchez's phone, and then that they found "teen porn" on the phone and then provided him a download of the cellphone's contents.

For defense counsel to pursue a negotiated resolution from early in the case up until the eve of trial was sound strategy. Disclosure of the videos Sanchez requested be offered in evidence was appropriate pre-trial disclosure of exhibits the defense planned to offer. Disclosure of the purpose for which the defense would use the exhibits, that is, to support Sanchez's defense that he was suspicious about "Emily" being fictitious all along, was part of the settlement negotiations. In his new trial motion and in this appeal, Sanchez has claimed Ahmed's efforts "backfired" because they led the People to seek a warrant and to further search his cellphone resulting in their discovery of his searches for legal adult "teen" pornography from Pornhub. But we do not judge defense counsel's tactical decisions, especially those made on the eve of or during trial, with the benefit of hindsight. Defense counsel endeavoring to persuade the People to offer a plea agreement without a sex offender registration requirement on the eve of trial could not necessarily anticipate that the result would be the People obtaining a search warrant to review a cellphone they had long had in their possession, much less that they would find what they ultimately found. Moreover, even if Ahmed had moved to exclude the "teen porn" evidence once it was discovered, it is not at all clear that the trial court would have granted the motion since that evidence was highly relevant to whether Sanchez had an unnatural interest in children as required by Count 3 (§§ 288, subd. (c)(1), 664).

Further, Sanchez has not established prejudice. First, if the "teen porn" evidence had not been discovered at the beginning of the trial, once Sanchez testified in accordance with his defense that he lacked intent or knowledge that the individual he was communicating with was a minor, the People might well have realized his cell phone could contain evidence inconsistent with the testimony and obtained the evidence at that point, in

40

time to use it in rebuttal.  Thus, Sanchez has not shown Ahmed's eve-of-trial communication to the People about his theory of defense caused them to discover the "teen porn" evidence since his defense at trial might well have resulted in the cell phone search in any event.

Beyond that, even if the People had never discovered the evidence, which, as Sanchez puts it, "tended to discredit appellant's theory of the case—that he was only interested in sexual encounters with adult women," it is not reasonably probable its absence would have resulted in a different outcome.  Again, the People's case was very strong from the outset, long before the "teen porn" evidence emerged.  Sanchez's sexual interest in a minor was amply established by his sexually explicit texts with "Emily" about sexual touching and what each of them liked; his statement that he was "getting hot over here thinking about [touching her underdeveloped breasts]"; his repeated efforts to get her to meet him; his telling her, "I'm also a little nervous since you are younger but you got my attention," "By the way you are fucking beautiful" and "I can't believe I'm attracted to a younger girl"; and, after she responded affirmatively to his inquiry whether she ever "played with" herself, his response, "Now I'm really hot over here lol" and later, "Guess what you got me doing now."  All of this, along with Sanchez's admissions to Holcombe that he "got into it" when he was talking with Emily about "sexual stuff" and "shouldn't have" overwhelmingly established his sexual interest in a girl he believed was 14.

Sanchez's final claim of ineffective assistance is that his counsel treated him with a contemptuous attitude that "permeated his representation."  This argument repeats all the other claimed missteps he contends his counsel made and assumes counsel took or did not take certain steps because Sanchez could not pay him and because Sanchez declined to accept the plea

41

offer.  He also attributes to his counsel remarks during the closing argument that he characterizes as "expressions of contempt."

The trial court addressed the comments, observing,

"Defendant, in particular, points to language and references to race made by Counsel during closing argument.  The comments, standing alone and out of context are concerning.  However, when the closing argument is read in its entirety, and in the context of the evidence presented during the trial, Counsel's comments were aimed squarely at the People's case, a claim that the People engaged in an overreach in their investigation and during the trial, and that the investigator in this matter 'groomed' the Defendant, set him up, and that his testimony was not to be believed.  Counsel had engaged in a long and often very confrontational cross examination of the People's witness, Det. Holcombe.  Counsel pursued a theme of over-reach and bias by the People when, during closing, Counsel said:

> [']This case seems to hinge on **the People's belief** that you, the jury will believe that because Mr. Sanchez, a Hispanic man, looks like Shrek and apparently has zero success with women, **according to the prosecution,** that is so desperate that he's willing to throw away his professional soccer coaching career. . . . **The prosecution** wants you to believe that Mr. Sanchez is so dumb, so desperate. . . . But **it's the innuendo of the prosecution** where they want you to believe that perhaps he fits a profile of an individual that might do it, he's Hispanic, he's not attractive, allegedly . . .' (emphasis added)."

The trial court accurately quoted the relevant portion of defense counsel's closing.  Also, our review of the record reflects that Sanchez described his own dating life in his testimony this way.  "So I'm a guy that goes online.I've been doing that for about 10 years about, since I was 20.Do the 18-and-over websites.Not the handsomest guy.I used to be called Shrek when I was younger.Therefore, I work a little bit hard to convince ladies 18 and over.And I go for all the ages.  I was talking to 45-year-olds, 30-year-olds,

18-year-olds.Some people may not like the difference between the ages, but it's still legal from what I know.So I talk to all the women that I can."  His description was consistent with other evidence Sanchez himself proffered showing his online communications with a several women during the same period he was communicating with "Emily."  It was neither a reflection of contempt nor ineffective assistance for counsel to address the theory of prosecutorial overreach in the context of Sanchez's own self-deprecating testimony.

Finally, like the trial court, we are not persuaded that absent any of the claimed errors alone or all of them together, it is reasonably probable the case would have had a different outcome.  Nor are we convinced that any deficiencies in counsel's performance rendered the result of the trial unreliable or the proceeding fundamentally unfair.

## DISPOSITION

We affirm the judgment.

_____

STEWART, P. J.

We concur.

_____

RICHMAN, J.

_____

MILLER, J.

*People v. Sanchez* (A164179)

44